*Notice: This opinion is subject to correction before publication in the Pacific Reporter. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| YVONNE ITO, | ) | |
| | ) | Supreme Court No. S-17965 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-20-06229 CI |
| v. | ) | |
| | ) | O P I N I O N |
| COPPER RIVER NATIVE | ) | |
| ASSOCIATION, | ) | No. 7695 – April 26, 2024 |
| | ) | |
| Appellee. | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Dani Crosby, Judge.

Appearances: James J. Davis, Jr., Northern Justice Project, LLC, Anchorage, for Appellant. Richard D. Monkman and Nathaniel H. Amdur-Clark, Sonosky, Chambers, Sachse, Miller & Monkman, LLP, Juneau, for Appellee. Nicholas J. R. Gasca, Tanana Chiefs Conference, Fairbanks, for Amicus Curiae Tanana Chiefs Conference. Erin C. Dougherty Lynch, Matthew N. Newman, and Maggie Massey, Native American Rights Fund, Anchorage, for Amici Curiae Arctic Village Council, Alaska Native Tribal Health Consortium, Council of Athabascan Tribal Governments, Maniilaq Association, Southeast Alaska Regional Health Consortium, and United Tribes of Bristol Bay. Seth M. Beausang, Assistant United States Attorney, Anchorage, and Charles W. Scarborough and Martin Totaro, Department of Justice, and Brian M. Boynton, Acting Assistant Attorney General, Washington D.C., for Amicus Curiae United States. Laura Wolff, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Amicus Curiae State of Alaska.

Before: Winfree, Chief Justice, and Carney and Henderson, Justices, and Matthews and Fabe, Senior Justices.[*] [Maassen and Borghesan, Justices, not participating.]

HENDERSON, Justice
MATTHEWS, Senior Justice, dissenting.

## I.    INTRODUCTION

Copper River Native Association (CRNA) is an Alaska non-profit corporation formed and controlled by federally recognized Alaska Native tribes to provide services for members, including tribal health care. CRNA is defined as an inter-tribal consortium under a federal law that promotes tribal self-determination. The member tribes have authorized CRNA to receive healthcare funds from the federal government that would otherwise flow to the tribes. This case concerns whether CRNA is an arm of its member tribes and thus entitled to the tribes' sovereign immunity.

A former employee sued CRNA over her termination. The superior court dismissed her complaint because it concluded that CRNA was an arm of its member tribes and therefore entitled to sovereign immunity. The former employee appeals, arguing that CRNA is not entitled to tribal immunity under our 2004 decision in *Runyon ex rel. B.R. v. Association of Village Council Presidents*.[1] CRNA contends that if the former employee is correct, *Runyon* should be overruled.

We agree with CRNA that the legal landscape defining the contours of tribal sovereign immunity has shifted significantly since our decision in *Runyon*. Subsequent developments in tribal immunity doctrine have undermined *Runyon*'s

---

[*]    Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

[1]    84 P.3d 437, 440-41 (Alaska 2004) (holding that nonprofit corporation does not hold tribal sovereign immunity under real-party-in-interest analysis because member tribes are not directly at stake).

treatment of financial insulation as a threshold question. Instead of treating financial insulation as dispositive, we adopt a multi-factor inquiry informed by these recent developments to determine whether an entity is entitled to "arm-of-the-tribe" immunity. Applying the multi-factor inquiry, we conclude that CRNA is an arm of its member tribes. We therefore affirm the superior court.

## II.   FACTS AND PROCEEDINGS

Ahtna' T'Aene Nene', known in English as Copper River Native Association (CRNA), is a tribal organization formed as an Alaska nonprofit corporation in 1972. CRNA's articles of incorporation explain that it "is the historic successor of the Chief's Conference whose name is lost in antiquity, the traditional consultative and governing assembly of the Athabascan people of the Copper River Region from time immemorial." The articles also express an intent that CRNA "have all the rights, duties, powers, and privileges of this historic assembly."

CRNA's members are federally recognized tribes within the region. At the inception of this case the member tribes included the Native Village of Kluti-Kaah, the Native Village of Tazlina, the Gulkana Village Council, the Native Village of Gakona, and the Native Village of Cantwell. Each member tribe's council elects a representative to CRNA's board of directors. Directors and officers must be Alaska Natives, be enrolled in a member tribe, and physically reside in the region.

CRNA is an "inter-tribal consortium"[2] under the Indian Self-Determination and Education Assistance Act (ISDEAA).[3] It provides a variety of services on behalf of the federally recognized tribes that comprise it. According to the chair of CRNA's board of directors, the member tribes each "passed Tribal government resolutions authorizing CRNA to receive the Tribe's federal health care funds and

---

[2]    25 U.S.C. § 5381(a)(5).

[3]    Pub. L. No. 93-638, 88 Stat. 2203 (1975) (codified as amended at 25 U.S.C. §§ 5301-5423).

provide health care services to their Tribal members." Many of these services are funded through the Alaska Tribal Health Compact, a self-governance compact authorized by ISDEAA between the federal government and certain Alaska Native tribes or tribal organizations acting on their behalf, including CRNA. Funds distributed under the compact provide a substantial portion of CRNA's budget. Pursuant to one such agreement, CRNA established a "Senior Citizens' Program" to provide elders in CRNA's area with "nutrition services, . . . shopping assistance, passenger assistance, transportation, outreach and advocacy, information, and referral services."

Yvonne Ito was hired by CRNA as the Senior Services Program Director in January 2018. CRNA terminated Ito's employment in May 2019. Ito then sued CRNA, bringing a single claim of breach of the implied covenant of good faith and fair dealing in her employment contract. CRNA moved to dismiss her complaint under Alaska Civil Rule 12(b)(1), arguing the court lacked subject matter jurisdiction because CRNA was entitled to tribal sovereign immunity under 25 U.S.C. § 5381(b), the rights-and-responsibilities provision of ISDEAA,[4] and as an arm of its member tribes. CRNA emphasized that tribal sovereign immunity is a question of federal law and urged the superior court to evaluate the background principles of tribal sovereign immunity using the factors from the Ninth Circuit Court of Appeals' *White v. University of California*

---

[4] 25 U.S.C. § 5381(b) provides: "In any case in which an Indian tribe has authorized . . . an inter-tribal consortium . . . to plan for or carry out programs, services, functions, or activities (or portions thereof) on its behalf under this subchapter, the authorized . . . inter-tribal consortium . . . shall have the rights and responsibilities of the authorizing Indian tribe . . . . In such event, the term "Indian tribe" as used in this subchapter shall include such other authorized . . . inter-tribal consortium . . . ."

decision.[5] Ito countered that the superior court was bound to apply our decision in *Runyon* to evaluate whether CRNA was entitled to tribal sovereign immunity.[6]

The superior court granted CRNA's motion to dismiss. Although the court agreed with CRNA that *White* favored immunity, it did not apply *White* because it was not convinced that Ninth Circuit decisions preempted Alaska law when litigating tribal sovereign immunity in Alaska courts. The court instead concluded that CRNA was "entitled to assert tribal sovereign immunity under controlling federal statutory law" because ISDEAA mandated that inter-tribal consortia "have the rights and responsibilities of" the tribes that created them — including sovereign immunity. The court also held, in the alternative, that CRNA was entitled to sovereign immunity as an arm of its member tribes. The court reasoned that because the "tribes' funds that would otherwise be used to provide for healthcare for tribal members would be at risk in the event of an adverse judgment," the tribes were therefore the "real parties in interest" as defined in *Runyon*.

Ito appeals. Amici curiae briefs were filed by Tanana Chiefs Conference, Arctic Village Council, Alaska Native Tribal Health Consortium, Council of Athabascan Tribal Governments, Maniilaq Association, Southeast Alaska Regional Health Consortium, and United Tribes of Bristol Bay. At our invitation the State of Alaska and the United States participated as amici as well. We thank all amici for their helpful participation.

---

[5] 765 F.3d 1010, 1025-26 (9th Cir. 2014) (concluding entity holds tribal sovereign immunity as "arm of the tribe" by examining factors including entity's method of creation, purpose, structure, ownership, management, amount of tribal control, tribe's intent to share sovereign immunity, and financial relationship between tribe and entity (citing *Breakthrough Mgmt. Grp. Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1187 (10th Cir. 2010))).

[6] 84 P.3d 437 (Alaska 2004).

## III. STANDARD OF REVIEW

We review de novo "issues of sovereign immunity" and dismissals "for lack of subject matter jurisdiction."[7]  In doing so "we will adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[8]

## IV. DISCUSSION

This case requires us to review the doctrine of tribal sovereign immunity and how it applies to legal entities that, while formally distinct from tribes, nonetheless function as arms of tribes.  We discuss the fundamentals of tribal sovereign immunity as established by the United States Supreme Court; our 2004 *Runyon* decision concerning arm-of-the-tribe immunity; and subsequent state and federal cases regarding tribal immunity decided since *Runyon*.  With that background in mind, we then evaluate whether CRNA is entitled to tribal sovereign immunity as an arm of its member tribes.

### A. Fundamentals Of Tribal Sovereign Immunity

Native tribes are "distinct, independent political communities, retaining their original natural rights."[9]  "In other words, they are sovereigns."[10]  "Among the core aspects of sovereignty that tribes possess . . . is the 'common-law immunity from

---

[7]  *Douglas Indian Ass'n v. Cent. Council of Tlingit & Haida Indian Tribes of Alaska*, 403 P.3d 1172, 1175 (Alaska 2017) (quoting *Healy Lake Vill. v. Mt. McKinley Bank*, 322 P.3d 866, 871 (Alaska 2014)).

[8]  *Id.*

[9]  *Runyon ex rel. B.R. v. Ass'n of Vill. Council Presidents*, 84 P.3d 437, 439 (Alaska 2004) (quoting *Worcester v. Georgia*, 31 U.S. 515, 559 (1832)); *see also Haaland v. Brackeen*, 143 S.Ct. 1609, 1647 (2023) (Gorsuch, J., concurring) (recognizing that under "Indian-law bargain struck in our [U.S.] Constitution," tribes remain "independent sovereigns").

[10]  *Runyon*, 84 P.3d at 439.

suit traditionally enjoyed by sovereign powers.' "[11] Federally recognized tribes are therefore "entitled to tribal sovereign immunity in Alaska state court."[12]

Despite federally recognized tribes' inherent sovereign authority, the United States Supreme Court has held that, as domestic dependent nations, "the tribes are subject to plenary control by Congress."[13] Congressional legislation can thus abrogate tribal sovereign immunity, but only when "Congress [has] 'unequivocally' express[ed] that purpose."[14] "Th[is] rule of construction reflects an enduring principle of Indian law: Although Congress has plenary authority over tribes, courts will not lightly assume that Congress in fact intends to undermine Indian self-government."[15] Moreover, tribal immunity "is a matter of federal law and is not subject to diminution by the States."[16]

---

[11] *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978)); *see also* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 7.05 [1][a] (Nell Jessup Newton ed., 2012 ed. 2019) ("The doctrine of tribal sovereign immunity is rooted in federal common law and reflects the federal Constitution's treatment of Indian tribes as governments in the Indian commerce clause."); *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 387 (2023) ("Our cases have thus repeatedly emphasized that tribal sovereign immunity, absent a clear statement of congressional intent to the contrary, is the 'baseline position.' " (quoting *Bay Mills*, 572 U.S. at 790)).

[12] *Douglas Indian Ass'n*, 403 P.3d at 1176; *see Bay Mills*, 572 U.S. at 789.

[13] *Bay Mills*, 572 U.S. at 788.

[14] *Id.* at 790 (quoting *C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 418 (2001)).

[15] *Id.*

[16] *Id.* at 789 (quoting *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 756 (1998)).

A tribe may also waive its own sovereign immunity.[17] To do so, the tribe's waiver must be clearly expressed.[18] We have explained that a tribe may "choose to waive its own immunity for transparency and accountability reasons or protect its interests when entering into a contract with another tribe by negotiating a waiver of the other tribe's immunity."[19] And we have further emphasized that the " 'federal policies of tribal self[-]determination, economic development, and cultural autonomy' are better served by leaving these decisions up to the tribes."[20]

A legal entity formally distinct from a tribe may still "be 'so closely allied with and dependent upon the tribe' that it is effectively an 'arm of the tribe.' It is then 'actually a part of the tribe *per se*, and, thus, clothed with tribal immunity.' "[21] Although the United States Supreme Court has recognized that tribal sovereign immunity may remain intact when a tribe acts through a formally distinct "arm,"[22] it

---

[17]     *Douglas Indian Ass'n*, 403 P.3d at 1179; *Bay Mills*, 572 U.S. at 796.

[18]     *C & L Enters.*, 532 U.S. at 418-23.

[19]     *Douglas Indian Ass'n*, 403 P.3d at 1179.

[20]     *Id.* (footnote omitted) (quoting *Runyon ex rel. B.R. v. Ass'n of Vill. Council Presidents*, 84 P.3d 437, 440 (Alaska 2004)).

[21]     *Runyon*, 84 P.3d at 439-40 (footnotes omitted) (first quoting *Ransom v. St. Regis Mohawk Educ. & Cmty. Fund, Inc.*, 658 N.E.2d 989, 992, 993 (N.Y. 1995); and then quoting *Dixon v. Picopa Constr. Co.*, 772 P.2d 1104, 1108 (Ariz. 1989)); *see also White v. Univ. of Cal.*, 765 F.3d 1010, 1025 (9th Cir. 2014) ("Tribal sovereign immunity not only protects tribes themselves, but also extends to arms of the tribe acting on behalf of the tribe."); *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 177-85 (4th Cir. 2019) (determining that companies operated by tribe were entitled to tribal sovereign immunity).

[22]     *See Lewis v. Clarke*, 137 S.Ct. 1285, 1290-92 (2017) (agreeing that an "arm" of a sovereign "generally enjoys the same immunity as the sovereign itself"); *Bay Mills*, 572 U.S. at 824 n.4 (2014) (Thomas, J., dissenting) (collecting lower courts cases extending tribal immunity to "arms of the tribe"); *Inyo Cnty. v. Paiute-Shoshone Indians of the Bishop Cmty.*, 538 U.S. 701, 704, 706-12 (2003) (discussing the Paiute Palace Casino as functionally the same as the Tribe).

"has not articulated a framework for determining whether a particular entity should be considered an arm of the tribe."[23] Without controlling authority from the Supreme Court, federal and state courts have articulated various approaches to arm-of-the-tribe immunity.[24]

### B. *Runyon ex rel. B.R. v. Association of Village Council Presidents*

We announced our approach to determining what entities have arm-of-the-tribe immunity in our 2004 *Runyon* decision.[25] *Runyon* concerned the Association of Village Council Presidents (AVCP), "a nonprofit corporation serving the fifty-six Native villages of the Yukon-Kuskokwim Delta."[26] The board of directors was comprised of one representative from each member village, and each representative had a single, equal vote.[27] AVCP explained that it operated a variety of "traditionally governmental programs designed to benefit the member tribes," including providing social services, coordinating village law enforcement, and contracting with the federal government to provide services under ISDEAA.[28] Two children's parents brought tort claims against AVCP for injuries their children allegedly received in its Head Start

---

[23] *Williams*, 929 F.3d at 176 (citing *Inyo Cnty.*, 538 U.S. at 704, 705 n.1); s*ee also Bay Mills*, 572 U.S. at 824 n.4 (Thomas, J., dissenting) (recognizing that lower courts have extended tribal immunity to "arms of the tribe").

[24] *See, e.g.*, *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1187-88 (10th Cir. 2010) (laying out "arm of the tribe" multi-factor test in seminal federal case); *Great Plains Lending, LLC v. Dep't of Banking*, 259 A.3d 1128, 1140-42 (Conn. 2021) (discussing "a series of federal and state cases" that have attempted to outline how to determine if an entity is an arm of the tribe).

[25] 84 P.3d at 440-41.

[26] *Id.* at 438.

[27] *Id.*

[28] *Id.*

program.[29]  AVCP moved to dismiss, asserting it was entitled to tribal sovereign immunity.[30]

In analyzing AVCP's assertion of immunity, we looked to a New York decision for guidance.[31]  We first explained that sovereign immunity "may extend to an institution that is the arm of multiple tribes, such as a joint agency formed by several tribal governments."[32]  But we also determined that an entity "takes on tribal sovereign immunity only if the tribe or tribes . . . are the real parties in interest."[33]  We then concluded that the tribes in that matter were not the real parties in interest because AVCP was financially insulated by virtue of its corporate status such that "[a]ny judgment against AVCP w[ould] be paid out of [AVCP's] coffers alone."[34]  We held that "[b]y severing [the tribes'] treasuries from the corporation, [the tribes] have also cut off their sovereign immunity before it reaches AVCP."[35]

In *Runyon* our approach relied on the then-current landscape of arm-of-the-tribe jurisprudence.  We considered the various approaches applied in state and federal courts across the country interpreting federal law and precedent, informed by

---

[29]  *Id.*

[30]  *Id.* at 439.

[31]  *See id.* at 439-40 (citing *Ransom v. St. Regis Mohawk Educ. & Cmty. Fund, Inc.*, 658 N.E.2d 989, 993 (N.Y. 1995)).

[32]  *Id.* at 440.

[33]  *Id.* (citing *Ransom*, 658 N.E.2d at 993).

[34]  *Id.* at 441.

[35]  *Id.*

both single-factor or threshold tests[36] and multi-factor tests.[37]  We acknowledged that other factors "may assist in [an arm-of-the-tribe] determination," particularly when a tribe would be legally responsible for the entity's obligations.[38]  However, we declined to "refine these other factors" in *Runyon* because financial insulation was "the most important factor," and it was dispositive.[39]

C.    **Subsequent Developments In Tribal Sovereign Immunity Doctrine**

The legal landscape surrounding tribal sovereign immunity has developed substantially since we decided *Runyon* in 2004.  As in *Runyon*, our interpretation of federal law governing tribal immunity is informed by developments in federal and state approaches, so we discuss each of them below.  Multiple federal circuit courts have adopted frameworks for evaluating arm-of-the-tribe immunity, and none treat financial insulation as dispositive.[40]  A number of states have also considered arm-of-the-tribe

---

[36]    *Id.* at 441 n.16 (citing *Ransom*, 658 N.E.2d at 992); *White Mountain Apache Tribe v. Smith Plumbing Co., Inc.*, 856 F.2d 1301, 1305-06 (9th Cir. 1988) (holding that sovereign immunity does not bar action against Tribe's surety because judgment against surety will not run against Tribe).

[37]    *Id.* at 440 n.15 (citing *Dixon v. Picopa Constr. Co.*, 772 P.2d 1104, 1109-10 (Ariz. 1989)); id at 441 n.16 (citing *Gavle v. Little Six, Inc.*, 555 N.W.2d 284, 294 (Minn. 1996) and William V. Vetter, *Doing Business with Indians and the Three "S"es: Secretarial Approval, Sovereign Immunity and Subject Matter Jurisdiction*, 36 ARIZ. L. REV. 169, 176-77 (1994) (collecting cases and discussing different factors courts have used in determining if organization is subordinate part of tribal government)).

[38]    *Id.* at 441.

[39]    *Id.*

[40]    *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1187 (10th Cir. 2010); *White v. Univ. of Cal.*, 765 F.3d 1010, 1025 (9th Cir. 2014); *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 177-85 (4th Cir. 2019).

immunity, with most embracing approaches that do not rely primarily on financial insulation.[41]

In 2010 the Tenth Circuit Court of Appeals decided *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*.[42] *Breakthrough* explicitly rejected our approach in *Runyon* that treated financial insulation as a threshold determination, holding that although "the financial relationship between a tribe and its economic entities is a relevant measure of the closeness of their relationship, . . . it is *not* a dispositive inquiry."[43] *Breakthrough* instead articulated six factors to guide an arm-of-the-tribe immunity inquiry:

> (1) the method of creation of the economic entities; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) the tribe's intent with respect to the sharing of its sovereign immunity; and (5) the financial relationship between the tribe and the entities. Furthermore, our analysis also is guided by a sixth factor: the policies underlying tribal sovereign immunity and its connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities.[44]

---

[41] *See Wright v. Colville Tribal Enter. Corp.*, 147 P.3d 1275, 1279 (Wash. 2006); *Cash Advance & Preferred Cash Loans v. State ex rel. Suthers*, 242 P.3d 1099, 1110 (Colo. 2010); *People ex rel. Owen v. Miami Nation Enters.*, 386 P.3d 357, 366-67 (Cal. 2016); *Hwal'Bay Ba: J Enters., Inc. v. Jantzen*, 458 P.3d 102, 107-10 (Ariz. 2020); *Great Plains Lending, LLC v. Dep't of Banking*, 259 A.3d 1128, 1142-43 (Conn. 2021); *State ex rel. Workforce Safety & Ins. v. Cherokee Servs. Grp., LLC*, 955 N.W.2d 67, 73-74 (N.D. 2021). *But see Sue/Perior Concrete & Paving, Inc. v. Lewiston Golf Course Corp.*, 25 N.E.3d 928, 935-36 (N.Y. 2014) (relying primarily on financial insulation).

[42] 629 F.3d 1173 (10th Cir. 2010).

[43] *Id.* at 1187 (emphasis in original).

[44] *Id.* (citations omitted).

The Tenth Circuit explained that it identified these factors by "look[ing] to the various tests used by federal courts, as well as state courts," and choosing factors that it believed were "most helpful in this particular instance."[45] But the court also noted it had "*not* concluded that th[e]se factors constitute an exhaustive listing or that they will provide a sufficient foundation in every instance for addressing" arm-of-the-tribe immunity.[46] The entities in *Breakthrough* were formed by a tribe and operated a casino on its behalf; they were not incorporated under state law.[47] Applying the factors, the court concluded that the entities were "so closely related to the Tribe that they should share in the Tribe's sovereign immunity."[48]

The Tenth Circuit considered arm-of-the-tribe immunity again in its 2012 *Somerlott v. Cherokee Nation Distributors, Inc.* decision.[49] Unlike in *Breakthrough*, the entity in *Somerlott* was organized as a for-profit limited liability company under state law.[50] This distinction was crucial, according to the court, because tribal sovereign immunity was coextensive with the United States' sovereign immunity under its precedent, and immunity for the United States did "not extend to its sub-entities incorporated as distinct legal entities under state law."[51] The court opined that the *Breakthrough* factors were inapplicable, and the entity was not entitled to sovereign immunity.[52] It ultimately concluded that the arm-of-the-tribe issue had neither been

---

[45]   *Id.* at 1187 n.10.

[46]   *Id.* (emphasis in original).

[47]   *Id.* at 1177, 1180.

[48]   *Id.* at 1191-95.

[49]   686 F.3d 1144 (10th Cir. 2012).

[50]   *Id.* at 1146, 1149.

[51]   *Id.* at 1150; *see also id.* at 1154-58 (Gorsuch, J., concurring) (elaborating on reasons for concluding that state-incorporated for-profit entities lack sovereign immunity).

[52]   *Id.* at 1149-50 (majority opinion).

properly preserved for appeal nor presented plain error thereby permitting appellate review.[53]

Two years later the Ninth Circuit Court of Appeals decided *White v. University of California* and adopted the first five *Breakthrough* factors to guide its analysis.[54] The entity at issue was an organization formed by multiple tribes through tribal resolutions and incorporated under state law to facilitate the repatriation of Native American remains.[55] The court concluded that the entity was entitled to arm-of-the-tribe immunity, even though the entity was formed by multiple tribes and incorporated under state law.[56] Notably, the court also expressly rejected arguments that the tribes' decision to incorporate under state law waived the entity's sovereign immunity and that the tribes waived sovereign immunity by filing suit in the Southern District of California.[57]

---

[53]    *Id.* at 1150-52. One federal district court in the Tenth Circuit concluded in 2014 that the Association of Village Council Presidents had no sovereign immunity by reading *Somerlott* to mean that the *Breakthrough* test "is inapplicable when a tribe or tribes form an entity under the law of a different sovereign, such as a state, and the entity in question must be organized under tribal law to qualify as a subordinate economic entity," even if the entity performs governmental functions. *See Eaglesun Sys. Prods., Inc. v. Ass'n of Vill. Council Presidents*, No. 13-CV-0438-CVE-PJC, 2014 WL 1119726, at *7-9 (N.D. Okla. Mar. 20, 2014). But we are not persuaded by this reasoning. As articulated below, we are not convinced that the analysis applicable to the for-profit company in *Somerlott* applies to all tribal entities and all corporate forms for all purposes.

[54]    765 F.3d 1010, 1025 (9th Cir. 2014).

[55]    *Id.* at 1018.

[56]    *Id.* at 1025-26, 1029.

[57]    *Id.* at 1025-26 (explaining tribe's voluntary waiver of sovereign immunity must be "unequivocally expressed"). The Ninth Circuit also did not apply a threshold incorporation analysis like that in *Somerlott* to this organization, which described itself as "an outgrowth of tribal leaders and members [sic] concerns over" repatriating tribal remains. *See id.* at 1018, 1025-26.

In 2019 the Fourth Circuit Court of Appeals examined arm-of-the-tribe immunity in *Williams v. Big Picture Loans, LLC* and, like the Ninth Circuit, adopted the first five *Breakthrough* factors.[58] It also interpreted the Ninth Circuit's decision in *White* as implicitly adopting the sixth *Breakthrough* factor because the decision "considers the central purposes underlying the doctrine of tribal sovereign immunity."[59] The court explained that the sixth factor "overlaps significantly with the first five" and "is too important to constitute a single factor."[60] *Williams* primarily concerned two entities formed by a tribe, "Big Picture" and "Ascension."[61] Big Picture was an "independent tribal lending" entity, and Ascension was "engag[ed] in marketing, technological, and vendor services to support the Tribe's lending entities."[62] Both were incorporated under tribal law.[63] Employing the *Breakthrough* factors, the court concluded that both entities were entitled to immunity.[64]

A number of state courts also have considered arm-of-the-tribe immunity since *Runyon*. Like the federal circuit courts, most have rejected formal financial

---

[58]    929 F.3d 170, 177 (4th Cir. 2019).

[59]    *Id.* (citing *White*, 765 F.3d at 1026).

[60]    *Id.*

[61]    *Id.* at 174.

[62]    *Id.* at 174-75.

[63]    *Id.* at 177.

[64]    *Id.* at 177-85.

insulation as a dispositive factor.[65] New York is the sole outlier; in 2014 the New York Court of Appeals reaffirmed the real-party-in-interest test that we adopted in *Runyon*.[66]

In 2016 the California Supreme Court adopted the first five *Breakthrough* factors, determining that they "properly account for the understanding that tribal immunity is both 'an inherent part of the concept of sovereignty' and 'necessary to promote the federal policies of tribal self[-]determination, economic development, and cultural autonomy.' "[67] The court emphasized that the inquiry "takes into account both formal and functional aspects of the relationship between the tribes and their affiliated entities."[68] Four years later the Arizona Supreme Court identified "six non-exclusive factors" largely aligning with the *Breakthrough* factors to evaluate arm-of-the-tribe immunity.[69] That court adopted California's emphasis on "both formal and functional considerations," stating that an entity must show it "is — in practice and on paper — an arm of the tribe."[70] In 2021 the Connecticut Supreme Court evaluated arm-of-the-

---

[65] *See Cash Advance & Preferred Cash Loans v. State ex rel. Suthers*, 242 P.3d 1099, 1110-11 (Colo. 2010) (adopting three factors not including financial insulation); *People ex rel. Owen v. Miami Nation Enters.*, 386 P.3d 357, 371-74 (Cal. 2016) (adopting first five *Breakthrough* factors); *Hwal'Bay Ba: J Enters., Inc. v. Jantzen*, 458 P.3d 102, 108-10 (Ariz. 2020) (adopting six factors similar to *Breakthrough*); *Great Plains Lending, LLC v. Dep't of Banking*, 259 A.3d 1128, 1143 (Conn. 2021) (adopting first five *Breakthrough* factors); *Lustre Oil Co. LLC v. Anadarko Mins., Inc.*, 527 P.3d 586, 590-91 (Mont. 2023).

[66] *See Sue/Perior Concrete & Paving, Inc. v. Lewiston Golf Course Corp.*, 25 N.E.3d 928, 935-36 (N.Y. 2014).

[67] *Miami Nation*, 386 P.3d at 371 (alteration in original) (quoting *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1182 (10th Cir. 2010)).

[68] *Id.* at 361.

[69] *See Hwal'Bay Ba*, 458 P.3d at 108-10 (considering creation, purpose, control, tribal intent, financial relationship, and federal policies underlying immunity).

[70] *Id.* at 110.

tribe immunity and similarly adopted the first five *Breakthrough* factors.[71]  However, the court declined to emphasize "the functional aspects of an entity's stated purpose and financial relationship" because "an exacting inquiry into the operation of tribal treasuries goes too far."[72]  That court determined a functional inquiry was "unworkable and potentially inimical to the principle of self-governance underlying tribal immunity" because it might lead to invasive financial review, and a "nebulous, subjective, difficult to apply inquiry" into the tribe or entity's finances.[73]

More recently, the Montana Supreme Court agreed that the factors considered by the Tenth Circuit in *Breakthrough* and by the Ninth Circuit in *White* "provide useful guidance" in analyzing whether an entity is an arm of one or more tribes, and focused particularly on the nature of the entity's activities.[74]  There, the court considered whether an entity that was formed by several tribes and incorporated under state law in order to develop the involved tribes' oil and gas leases was an arm of the involved tribes.[75]  The court recognized that "[t]ribes often form, and rely on, entities to carry out key aspects of tribal self-governance," and emphasized "the importance of examining the circumstances of each case rather than utilizing a single-inquiry test to analyze tribal sovereign immunity."[76]  Citing and agreeing with a multitude of courts that "state incorporation alone does not abrogate an entity's immunity,"[77] the court reasoned that "the nature of the entity's activity — not just whether the entity is

---

[71]     *Great Plains Lending, LLC v. Dep't of Banking*, 259 A.3d 1128, 1143 (Conn. 2021).

[72]     *Id*. at 1142.

[73]     *Id.*

[74]     *Lustre Oil Co. LLC v. Anadarko Mins, Inc.*, 527 P.3d 586, 591 (Mont. 2023).

[75]     *Id.* at 589-91.

[76]     *Id.* at 590.

[77]     *Id.*

incorporated under state or tribal law — should remain an important consideration when determining whether to extend immunity."[78] The court further held that when assessing the factors outlined in *Breakthrough* and *White*, "the analysis should be guided by the 'central policies' supporting tribal sovereign immunity, including the 'preservation of tribal cultural autonomy' and the 'preservation of tribal self-determination.' "[79]

### D.  Today's Holding Regarding Arm-Of-The-Tribe Immunity

As Ito argues, applying *Runyon*'s threshold financial insulation inquiry could lead us to conclude that CRNA is not an arm of its member tribes and thus not entitled to sovereign immunity.  Like the entity in *Runyon,* CRNA is an Alaska nonprofit corporation legally separate from its member tribes, and the tribes would therefore not be directly responsible for a judgment against CRNA.[80]  In *Runyon* we treated that financial separation as dispositive, even though the entity was controlled by tribes and a judgment against the entity could have an indirect financial impact on the tribes.[81]

Given the developments in tribal immunity doctrine since *Runyon*, CRNA urges us to overrule *Runyon*'s treatment of financial insulation as a threshold inquiry. CRNA argues we should instead take guidance from the more recent federal decisions and adopt the Ninth Circuit's analysis in *White* to evaluate arm-of-the-tribe immunity. We agree with CRNA that the legal landscape has evolved since our decision in *Runyon*. Considering both the significantly changed legal landscape and the greater good than harm that will result from revising our approach, we overrule *Runyon* and adopt a multi-factor approach to evaluating arm-of-the-tribe immunity.

---

[78]    *Id.* at 591.

[79]    *Id.* (quoting *White v. Univ. of Cal.*, 765 F.3d 1010, 1025 (9th Cir. 2014)).

[80]    *Cf. Runyon ex rel. B.R. v. Ass'n of Vill. Council Presidents*, 84 P.3d 437, 438-39 (Alaska 2004).

[81]    *See id.* at 438-41.

### 1. *Runyon*'s threshold financial insulation inquiry should be overruled.

"Stare decisis compels us to approach overruling one of our prior decisions carefully."[82] CRNA therefore bears the " 'heavy threshold burden' of demonstrating 'compelling reasons for reconsidering' " *Runyon*.[83] We will overturn one of our prior decisions only when we are "clearly convinced that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a departure from precedent."[84] We conclude that CRNA has met that burden of establishing changed conditions since we decided *Runyon*, given the developments in federal law around arm-of-the-tribe analysis. We also conclude that more good than harm will result from revising our approach.

#### a. Conditions have changed substantially since *Runyon*.

A party can support a departure from precedent due to changed conditions by showing that "related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine, [or] facts have so changed or come to be seen so differently, as to have robbed the old rule of significant application."[85] Doctrinal developments that demonstrate changed conditions can come from a "new diversity of opinions among the high courts of states throughout the country"[86] or from "changes in the federal cases in the years since" the prior decision.[87]

---

[82]   *State v. Carlin*, 249 P.3d 752, 757 (Alaska 2011).

[83]   *Buntin v. Schlumberger Tech. Corp.*, 487 P.3d 595, 603 (Alaska 2021) (quoting *Thomas v. Anchorage Equal Rts. Comm'n*, 102 P.3d 937, 943 (Alaska 2004)).

[84]   *Carlin*, 249 P.3d at 756 (quoting *Pratt & Whitney Canada, Inc. v. Sheehan*, 852 P.2d 1173, 1175-76 (Alaska 1993)).

[85]   *Id.* at 758 (alteration in original) (quoting *Pratt & Whitney*, 852 P.2d at 1175-76).

[86]   *Id.* at 761.

[87]   *Kinegak v. State, Dep't of Corr.*, 129 P.3d 887, 889-90 (Alaska 2006).

CRNA argues that conditions have changed because *Runyon*'s threshold financial insulation inquiry "has been rejected by the federal courts" and "has been widely criticized." CRNA points to the significant developments in tribal immunity doctrine outlined above to support its position. Despite these developments, Ito contends that nothing has changed and emphasizes the heavy burden that CRNA must meet to justify overruling precedent.

We agree with CRNA. The shifting legal landscape since *Runyon* has changed conditions such that *Runyon*'s threshold financial insulation inquiry is no longer sound. This aspect of *Runyon* has become the minority rule. As discussed above, none of the federal circuit courts that have evaluated arm-of-the-tribe immunity since *Runyon* consider an entity's financial insulation from its member tribes to be dispositive.[88] Indeed, the Tenth Circuit explicitly criticized *Runyon*'s approach as "the

---

[88] The Tenth Circuit in *Somerlott v. Cherokee Nation Distributors* commented favorably on a threshold financial insulation inquiry applied before a multi-factor test in its review of the "subordinate economic entity doctrine," but only in dicta. 686 F.3d 1144, 1148-50 (10th Cir. 2012). As an initial matter, we consider *Somerlott* distinguishable based on the nature of the entity at issue. *Id.* As the *Somerlott* concurrence notes, the entity at issue in *Somerlott* was a for-profit chiropractic business that "serve[d] mostly non-Indians and operate[d] off reservation" such that finding immunity would render it "some sort of secret sovereign." *Id.* at 1154 (Gorsuch, J., concurring). We are not convinced that the analysis referred to in *Somerlott* applies in the same way to CRNA, a non-profit that holds itself out as a tribal healthcare organization and as the historic successor of a tribal governing body, serving its member tribes' communities and regions. Moreover, *Somerlott*'s treatment of an entity's incorporation under state law as automatically disqualifying the entity from being an arm of one or more tribes seems functionally to engage in a waiver analysis — one which appears to impermissibly depart from the requirement that any waiver of sovereign immunity must be express and unequivocal. *See Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998); *see also Lustre Oil Co. LLC v. Anadarko Mins, Inc.*, 527 P.3d 586, 602-03 (Mont. 2023) (McKinnon, J., concurring) ("I would reject *Somerlott*'s reasoning and conclusion that a tribal entity incorporating in [a] state automatically and unequivocally waives its sovereign immunity. . . . [T]he *Somerlott*

- 20 -                                    **7695**

wrong legal standard."[89]   Most states have similarly declined to treat the financial relationship between a tribe and its arm as a threshold factor and instead have adopted multiple factors relevant to evaluating a tribe or tribes' relationship to a tribal entity to guide the arm-of-the-tribe inquiry.

The State of Alaska claims that these significant developments are far afield from the only inquiry actually endorsed by the United States Supreme Court, which is a real-party-in-interest test like *Runyon*'s.  It relies on *Lewis v. Clarke*,[90] which concerned whether tribal sovereign immunity extends to employees of tribes and arms of tribes.[91]  According to the State, this precedent demonstrates that the Supreme Court would apply a real-party-in-interest test like *Runyon*'s to evaluate arm-of-the-tribe immunity if it reached the issue.  We are not persuaded.

In *Lewis* the Supreme Court considered whether an employee of a tribal gaming authority was entitled to sovereign immunity from a lawsuit against the employee in his individual capacity.[92]  The Court first stated that the gaming authority was "an arm of the Tribe" and noted that tribal law provided "sovereign immunity and indemnification policies" that applied to the authority.[93]  Analogizing to lawsuits against state employees, the Court explained that "an arm or instrumentality of the State

---

analysis presumes an unequivocal waiver in every instance and context, contrary to well established precedent.").

[89]     *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184, 1186-87 (10th Cir. 2010) (concluding "the financial relationship between a tribe and its economic entities . . . is not a dispositive inquiry" and establishing multi-factor test).

[90]     581 U.S. 155 (2017).

[91]     *See id.* at 159-61.

[92]     *Id*.

[93]     *Id.* at 159.

generally enjoys the same immunity as the sovereign itself."[94]  Importantly, whether an entity is an arm of a tribe is a separate and distinct analysis from whether an employee of a sovereign (or its arm) is entitled to share the sovereign's immunity.[95]  Indeed, in deciding that the gaming authority was an arm of the tribe, the Court did not analyze whether the tribe was responsible for the authority's obligations; nor did it apply a real-party-in-interest test to reach this conclusion.[96]  Rather, it applied a real-party-in-interest test only to determine who was being sued:  an individual in his personal capacity or the tribe.[97]  We thus disagree with the State's argument that *Lewis* demonstrates the Court "uses the real-party-in-interest-test to determine which entities have sovereign immunity."

In sum, we agree with CRNA that the significant developments in tribal immunity doctrine since *Runyon* constitute changed circumstances.

### b. Removing financial insulation as a threshold inquiry will result in more good than harm.

Before overruling precedent we must also be convinced that doing so will result in more good than harm.[98]  "When determining if overruling precedent would do more good than harm, 'we must balance the benefits of adopting a new rule against the

---

[94]     *Id.* at 162.

[95]     *See id*. at 162-63.

[96]     *See id.* at 162-64.

[97]     *Id*. at 162-66.

[98]     *Buntin v. Schlumberger Tech. Corp.*, 487 P.3d 595, 605 (Alaska 2021).  We note that the dissent expresses doubt about whether the "more good than harm" analysis should apply in determining whether to overturn our precedent interpreting federal law; however, in the absence of a decision of the United States Supreme Court that would bind our interpretation, our precedent requires such analysis.  *See, e.g.*, *Charles v. State*, 326 P.3d 978, 983-84 (Alaska 2014) (recognizing need to conduct more good than harm analysis when determining whether to overturn precedent based upon developments in federal law); *Kinegak v. State*, 129 P.3d 887, 889-90, 892 n.31 (Alaska 2006).  No party has advocated otherwise in this matter.

benefits of stare decisis.' "[99]  The benefits of stare decisis include "providing guidance for the conduct of individuals, creating efficiency in litigation by avoiding the relitigation of decided issues, and maintaining public faith in the judiciary."[100]

CRNA devotes little effort to analyzing this element other than asserting that overruling *Runyon* would "[i]ndisputably" lead to more good than harm.  The amici curiae supporting CRNA offer additional helpful arguments.  They contend that overruling *Runyon* would do more good than harm because *Runyon*'s emphasis on financial insulation undermines tribal sovereignty, and they point out that little to no practical harm would result from adopting a broader multi-factor arm-of-the-tribe inquiry.

The United States asserts that "focus[ing] exclusively on a tribe's financial insulation from a hypothetical judgment . . . would not place enough weight on factors that promote federal tribal policies, including self-governance, that undergird tribal immunity."  And it notes that an exclusive focus "on whether a tribe is liable for a money judgment against the entity also overlooks other aspects of the financial relationship between a tribe and an entity," such as indirect costs of litigation and whether the entity is funded from money that would otherwise flow to tribes themselves.

Amicus Tanana Chiefs Conference (TCC) similarly warns that "[f]or every lawsuit that entities like TCC and CRNA have to defend, limited resources are diverted from [tribal health] programs that address preventative care, treat diseases, combat behavioral health disorders, and prevent suicide."  TCC also notes that, even with sovereign immunity, many claims against consortia could still proceed under the Federal Torts Claims Act, so bona fide plaintiffs often have "a recovery route"

---

[99]     *Id.* (quoting *State v. Carlin*, 249 P.3d 752, 761-62 (Alaska 2011)).

[100]     *Carlin*, 249 P.3d at 761-62.

regardless of whether the consortia are entitled to sovereign immunity. And regarding contractual obligations, TCC points out that "using the sovereign immunity defense as a cynical tool to avoid . . . agreements would only harm" itself, so it carefully crafts limited waivers of sovereign immunity and procures insurance to manage risks while honoring its obligations.

Amici Arctic Village Council and five inter-tribal consortia emphasize the tribes' sovereign rights "to determine how they will manage their resources, organize and deliver their governmental services, govern their affairs, and execute their sovereignty." As they explain, "Tribes in each region of Alaska organize differently." They contend that *Runyon*'s emphasis on formal financial insulation "impairs and undercuts tribal self-governance" by "forc[ing] a Tribe to choose between its state-court sovereign immunity and exercising its self-determination."

Ito urges us to retain *Runyon*, warning that broadening the arm-of-the-tribe inquiry would lead to "mischief and misconduct that results when and where absolute immunity exists." The State agrees with Ito and elaborates on the impacts it believes overruling *Runyon* would have on its sovereign interests. The State asserts that a broader arm-of-the-tribe inquiry "shields more entities from enforcement of clearly applicable state law," and it lists a number of examples such as tax collection, workers' compensation, and anti-discrimination laws. Despite these concerns, the State concedes that a variety of mechanisms would still allow it to pursue violations of state law, even if entities like CRNA were entitled to sovereign immunity.

We agree with CRNA and supporting amici that more good than harm will result from overruling *Runyon's* treatment of financial insulation as a threshold determination. The United States and the tribally affiliated amici are correct that *Runyon*'s narrow financial insulation inquiry undermines tribal sovereignty and fails to account for the "federal policies of tribal self[-]determination, economic development,

and cultural autonomy."[101] By choosing to form CRNA and pool federally provided resources to deliver services to their members, the tribes exercised their sovereign rights to self-governance and self-determination. Looking only at whether the tribes would be directly legally liable for a judgment against CRNA ignores the actual impacts of a judgment on the tribal interests that immunity is meant to protect. It is critical to our analysis in CRNA's case that, despite being a separate legal entity, most if not all of its federal funding comes directly from money that would otherwise go to the tribes. Applying a threshold financial insulation inquiry here would deprive the tribes of those funds while simultaneously relying on the notion that a judgment would not be satisfied out of the tribes' coffers. This ignores the practical reality of a judgment.[102]

We also disagree with Ito's predictions of mischief and misconduct and observe, contrary to Ito's argument, that arms of tribes do not, and will not, have "absolute immunity" if we overrule this aspect of *Runyon*. As the United States

---

[101] *Douglas Indian Ass'n v. Cent. Council of Tlingit & Haida Indian Tribes of Alaska*, 403 P.3d 1172, 1179 (Alaska 2017) (quoting *Runyon ex rel. B.R. v. Ass'n of Vill. Council Presidents*, 84 P.3d 437, 440 (Alaska 2004)).

[102] Observing that practical reality, the dissent appears to limit its conception of the "good" associated with a multi-factor arm-of-the-tribe analysis to a financial benefit to the involved tribes. The dissent contends that our "primary reason" for upholding tribal sovereign immunity is to preserve funds "destined to provide services to tribal members," and suggests that a similar rationale has been rejected in the context of charitable organizations. But this argument misses the point and certainly fails to capture the significant distinction between the policies underlying charitable immunity and those at work here. The dissent is correct that our analysis examines the impacts of litigation and a judgment on funds that would otherwise be destined to serve tribes directly, but this is because such impacts limit the decisions that tribes can make about how they govern themselves and, as here, how they provide essential services to their members. The dissent seems to discount entirely the connection between impacts on tribes' resources — particularly those connected with provision of essential services — and the ability of tribes to govern themselves. Such reasoning fails to account for the good associated with furtherance of "federal policies of tribal self[-]determination, economic development, and cultural autonomy." *Cf. id.* at 1179.

Supreme Court has noted, "immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims."[103] Ito and the State identify similar concerns. Importantly, though, those concerns voiced by Ito and the State, and echoed by the dissent, take issue more with tribal immunity itself than with the question of what factors should be considered in determining whether an entity is an arm of a sovereign. Indeed, the concerns stated by Ito and the State, when paired with explicit federal policy in favor of tribal self-governance,[104] would seem to make it all the more important for courts to employ an approach that accurately captures which entities are truly arms of tribes exercising their inherent ability to determine how to govern themselves and their members, and which are not. We are now convinced that the threshold financial insulation test used in *Runyon* does not do that.[105] In response to speculation about what harms may arise from revising our method for determining when an entity is an arm of a tribe, we also reiterate our observation that "a tribe can still choose to waive its own immunity for transparency and accountability reasons or [to] protect its interests when entering into a contract with another tribe by negotiating a waiver of the other tribe's immunity."[106] And we note that the federal policies underlying tribal immunity "are better served by leaving these decisions up to the tribes."[107]

We also recognize that "there is a benefit to uniformity in the law" and value the benefits of "consistency between Alaska and federal law."[108] Considering the

---

[103]    *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 758 (1998).

[104]    *See Douglas Indian Ass'n*, 403 P.3d at 1178-79.

[105]    *See Runyon*, 84 P.3d at 440-41.

[106]    *Douglas Indian Ass'n*, 403 P.3d at 1179.

[107]    *Id.*

[108]    *See Buntin v. Schlumberger Tech. Corp.*, 487 P.3d 595, 606 (Alaska 2021).

- 26 -                                                      **7695**

conflict between Alaska law in *Runyon* and the federal law governing arm-of-the-tribe analysis, we consider it a harm in itself to leave employees and employers subject to navigating an ongoing conflict between our state and federal law, particularly on issues of sovereign immunity controlled by federal law. We take seriously the potential harm involved in leaving employers subject to two contradictory standards under state and federal law, which can be cumbersome to interpret and understand for employers and factfinders alike, and risks the determination of an entity's immunity being a function of the forum.[109]

We further note that even when entities like CRNA are entitled to sovereign immunity, injured parties still have paths to redress. "Congress is in a position to weigh and accommodate the competing policy concerns and reliance interests,"[110] and Congress determined that certain claims against consortia like CRNA can proceed in federal court under the Federal Tort Claims Act.[111] The United States

---

[109] *See id. Compare Wilson v. Alaska Native Tribal Health Consortium*, 399 F. Supp. 3d 926, 936 (D. Alaska 2019) (concluding Alaska nonprofit tribal health consortium held sovereign immunity)*, appeal dismissed*, No. 19-35707, 2019 WL 7946348 (9th Cir. Dec. 30, 2019); *Barron v. Alaska Native Tribal Health Consortium*, 373 F. Supp. 3d 1232, 1241-42 (D. Alaska 2019) (concluding Alaska nonprofit tribal health consortium held sovereign immunity); *Matyascik v. Arctic Slope Native Ass'n, Ltd.*, No. 2:19-cv-0002-HRH, 2019 WL 3554687, at *1, *5 (D. Alaska Aug. 5, 2019) (concluding Alaska nonprofit tribal health organization held sovereign immunity); *and Manzano v. S. Indian Health Council*, No. 20-cv-02130-BAS-BGS, 2021 WL 2826072, at *1, *6 (S.D. Cal. July 7, 2021) (concluding nonprofit tribal health organization held sovereign immunity), *with Eaglesun Sys. Prods., Inc. v. Ass'n of Vill. Council Presidents*, No. 13-CV-0438-CVE-PJC, 2014 WL 1119726, at *1, *6-7 (N.D. Okla. Mar. 20, 2014) (concluding Alaska tribal nonprofit had no sovereign immunity because at time of Oklahoma court's decision "no court ha[d] ever found that these corporations or associations possess sovereign immunity from suit").

[110] *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 759 (1998).

[111] *See* 25 U.S.C. § 5321(d) (deeming employees of inter-tribal consortia to be federal employees in certain circumstances); 28 U.S.C. §§ 2671-2680 (establishing procedure for tort claims against federal employees).

Supreme Court has also held, analogizing to *Ex parte Young*,[112] that "tribal immunity does not bar . . . a suit for injunctive relief against *individuals*, including tribal officers, responsible for unlawful conduct."[113]  And as the State concedes, it has other mechanisms to enforce its laws, including negotiating waivers of immunity and criminally prosecuting officials, even if suits for damages are barred by sovereign immunity.

In short, we are convinced that more good than harm will result from updating our arm-of-the-tribe inquiry to account for the significant developments in federal law since 2004.  *Runyon*'s threshold financial insulation inquiry is overruled.

### 2.    Determining whether an entity is an arm of a tribe requires evaluating multiple factors; no single factor is dispositive.

Without *Runyon*'s treatment of financial insulation as a threshold factor, we ultimately determine that multiple factors must guide our approach to an arm-of-the-tribe inquiry.  CRNA and the United States urge us to adopt a multi-factor approach like the *Breakthrough* factors.  The United States agrees with the California Supreme Court that these factors "properly account for the understanding that tribal immunity is both an inherent part of the concept of sovereignty and necessary to promote the federal policies of tribal self-determination, economic development, and cultural autonomy."[114]

The State, on the other hand, suggests that either of two factors should be dispositive:  (1) whether an entity is controlled by multiple sovereigns; and (2) whether an entity is incorporated under state law.  First, the State argues that "[i]t is very unlikely

---

[112]    209 U.S. 123 (1908).

[113]    *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014) (emphasis in original).  We have not decided whether *Ex parte Young* applies in state court to tribal officials violating state law, and we need not do so now.  *See Douglas Indian Ass'n v. Cent. Council of Tlingit & Haida Indian Tribes of Alaska*, 403 P.3d 1172, 1180-81 (Alaska 2017) (declining to reach question because it was unnecessary to resolve case).

[114]    *People ex rel. Owen v. Miami Nation Enters.*, 386 P.3d 357, 371 (Cal. 2016) (alterations and internal quotations omitted).

that a consortium made of multiple tribes can ever be shielded by tribal sovereign immunity." This is so, according to the State, because to enter a consortium "each sovereign necessarily cedes some of its sovereign authority." For support the State relies on *Hess v. Port Authority Trans-Hudson Corp.*,[115] a United States Supreme Court decision concerning state sovereign immunity. This decision does not support the State's argument. *Hess* involved a bi-state entity created under the federal constitution's compact clause.[116] The Court cited its prior decision in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*[117] for a "general approach" to whether entities created under the compact clause qualified for state sovereign immunity.[118] That approach directed the Court to presume an entity lacked immunity "[u]nless there is good reason to believe that the States structured the new agency to enable it to enjoy the special constitutional protection of the States themselves, and that Congress concurred in that purpose."[119] Evaluating multiple "[i]ndicators of immunity or the absence thereof" that did not "all point the same way," the Court ultimately concluded that the entity was not entitled to immunity.[120] Contrary to the State's assertion, the framework in *Hess* suggests that a multi-state entity could be shielded by sovereign immunity in some circumstances. Moreover, the Court approvingly cited federal circuit court decisions in which multi-state entities were granted immunity.[121] And as the Court has previously explained, "the immunity possessed by Indian tribes is not

---

[115]  513 U.S. 30 (1994).

[116]  *Id.* at 35-37.

[117]  440 U.S. 391 (1979).

[118]  *Hess*, 513 U.S. at 43.

[119]  *Id.* at 42-44 (alteration in original) (quoting *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 401 (1979)).

[120]  *Id.* at 44-52.

[121]  *See id.* at 49-50.

coextensive with that of the States."[122]  We also observe that in *Runyon* we held that tribal immunity "may extend to an institution that is the arm of multiple tribes, such as a joint agency formed by several tribal governments,"[123] and no party asks us to overturn this aspect of *Runyon.*  If tribes were to create a multi-sovereign entity with no evidence that they intended to extend tribal sovereign immunity, that would weigh against immunity.  But we disagree with the State's suggestion that this factor is dispositive.  And here, as detailed below, there is evidence that CRNA was intended to share in the tribes' sovereign immunity.

Second, the State asserts that entities incorporated under state law "agree[] to suit under Alaska law" and thus "do not enjoy tribal sovereign immunity."  As discussed above, the Tenth Circuit expressed a similar position in analyzing a for-profit business serving mostly non-Native clients in *Somerlott*, explaining that tribal immunity was coextensive with the federal government's sovereign immunity, and immunity for the federal government did "not extend to its sub-entities incorporated as distinct legal entities under state law."[124]  But most other courts that have reached this question disagree, instead evaluating an entity's legal status within a multi-factor framework.[125]  And at least one court has expressly distinguished *Somerlott* based in

---

[122]     *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 756 (1998).

[123]     *Runyon ex rel. B.R. v. Ass'n of Vill. Council Presidents*, 84 P.3d 437, 440 (Alaska 2004).

[124]     *See Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d 1144, 1150 (10th Cir. 2012).  As CRNA notes, this discussion was dicta because the court ultimately held that the arm-of-the-tribe argument had not been preserved.  *Id.* at 1150-52.

[125]     *See White v. Univ. of Cal.*, 765 F.3d 1010, 1025-26 (9th Cir. 2014); *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 177 (4th Cir. 2019); *Sue/Perior Concrete & Paving, Inc. v. Lewiston Golf Course Corp.*, 25 N.E. 3d 928, 935-36 (N.Y. 2014); *People ex rel. Owen v. Miami Nation Enters.*, 386 P.3d 357, 372-74 (Cal. 2016); *Great Plains Lending, LLC v. Dep't of Banking*, 259 A.3d 1128, 1143 (Conn. 2021);

- 30 -                                                              **7695**

part on the nature and purpose of the tribal organization to hold that a tribal corporation formed under state law to participate in federal contracts is an arm of the tribe and entitled to immunity, where the tribal corporation furthers the tribe's governance objectives and the tribe retains permanent control of the corporation's board of directors.[126]

The United States Supreme Court has explicitly held that tribal immunity "is not subject to diminution by the States,"[127] so Alaska law does not have the power to abrogate tribal immunity. And even viewing a tribe's decision to incorporate an entity under the Alaska Nonprofit Corporation Act through the lens of waiver, we do not believe that decision *alone* is sufficiently clear and unequivocal to express a tribe's

---

*Lustre Oil Co. LLC v. Anadarko Mins., Inc.*, 527 P.3d 586, 589-91 (Mont. 2023). *But see State ex rel. Workforce Safety & Ins. v. Cherokee Servs. Grp., LLC*, 955 N.W.2d 67, 73 (N.D. 2021) (agreeing with *Somerlott* and holding that "[w]hen a tribal entity subjects itself to a state by organizing under the state's laws, it waives sovereign immunity.").

[126] *See Rassi v. Fed. Program Integrators, LLC*, 69 F. Supp. 3d 288, 291-92 (D. Me. 2014). While *Somerlott* involved a for-profit chiropractic office operating off-reservation and serving mostly non-Native clients, in *Rassi* the tribe formed the corporation "to advance its governmental objectives," appointed the entire board of directors, and "permanently reserved" directorships for tribal leaders. *Id.; cf. Somerlott*, 686 F.3d at 1150. Indeed, the *Rassi* court found the tribal corporation "far more analogous" to Amtrak, which the Supreme Court in *Lebron v. National R.R. Passenger Corp.* found to hold sovereign immunity as "part of the Government" because it furthered government objectives and the government retained "permanent authority to appoint a majority of the directors." *Id.* (quoting *Lebron*, 513 U.S. 374, 399 (1995)); *see also Lustre Oil*, 527 P.3d at 591 ("[T]he nature of the entity's activity — not just whether the entity is incorporated under state or tribal law — should remain an important consideration when determining whether to extend immunity.").

[127] *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 789 (2014) (quoting *Kiowa*, 523 U.S. at 756).

intent to waive sovereign immunity.[128] The law a tribe uses to create an entity is certainly relevant, but we decline to treat an entity's incorporation under the Alaska Nonprofit Corporation Act as dispositive.

Taking guidance from federal law, we conclude, like the Fourth, Ninth and Tenth Circuits, along with many state courts, that the *Breakthrough* factors guide our arm-of-the-tribe inquiry. These five factors — (1) purpose, (2) method of creation, (3) control, (4) tribal intent, and (5) financial relationship — properly account for the inherent sovereignty of tribes and the federal policies underlying tribal sovereign immunity, including tribal self-governance, self-sufficiency, and cultural autonomy.[129] *Breakthrough* also articulated a sixth factor, "whether the purposes of tribal sovereign immunity are served by granting immunity,"[130] but we agree with the California Supreme Court that this serves to focus the analysis of the individual factors on the purposes of tribal sovereign immunity and need not be considered separately.[131] No single factor is dispositive — even an entity's incorporation under state law.

---

[128] *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978) (holding waiver of tribal sovereign immunity must be unequivocally expressed); *Douglas Indian Ass'n v. Cent. Council of Tlingit & Haida Indian Tribes of Alaska*, 403 P.3d 1172, 1178 n.32 (Alaska 2017) ("[A] waiver of tribal sovereign immunity may not be implied.").

[129] While we adopt the same factors as the federal courts, our arm-of-the-tribe inquiry may differ somewhat from the inquiries in those jurisdictions. Decisions from other jurisdictions are not binding but are viewed as persuasive for their reasoning, to the extent it applies. *See Native Vill. of Tununak v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 334 P.3d 165, 175 (Alaska 2014) (reiterating that we are "not bound by decisions of federal courts other than the United States Supreme Court on questions of federal law" (quoting *Totemoff v. State*, 905 P.2d 954, 963 (Alaska 1995))). We note that Ito does not directly argue that CRNA would not qualify as an arm of the tribe under a multi-factor test.

[130] *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1181, 1186-87, 1191 (10th Cir. 2010).

[131] *People ex rel. Owen v. Miami Nation Enters.*, 386 P.3d 357, 371-72 (Cal. 2016).

### 3. CRNA is entitled to tribal sovereign immunity as an arm of its member tribes.

We must now apply the five factors identified above to determine whether CRNA should be considered an arm of its sovereign member tribes.

#### a. Purpose of the entity

The purpose factor "incorporates both the stated purpose for which the [e]ntit[y] [was] created as well as evidence related to that purpose."[132] The more the purpose relates to the goal of tribal self-governance, the stronger this factor will weigh in favor of immunity.[133] Evidence about the entity's activities is important to consider when evaluating the entity's purpose. But we agree with the Connecticut Supreme Court that conducting an overly intrusive inquiry into the activities of the tribe is "potentially inimical to the principle of self-governance underlying tribal immunity."[134] Thus, while the activities of the entity itself are relevant, courts should not require tribes to provide exhaustive evidence about their own activities when evaluating an entity's purpose.

CRNA's stated purposes include preserving the culture and promoting the welfare of Alaska Native people in the region. The chair of CRNA's board of directors explained that CRNA acts on behalf of its member tribes in healthcare matters, which she described as "a core Tribal governmental function." Each member tribe's council passed tribal governmental resolutions that authorize CRNA to receive the member tribes' federal healthcare funds to provide their tribal members' healthcare services.

---

[132] *Great Plains Lending, LLC v. Dep't of Banking*, 259 A.3d 1128, 1143-44 (Conn. 2021) (first alteration in original) (quoting *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 178 (4th Cir. 2019)).

[133] *See id.* at 1144 (citing *Williams*, 929 F.3d at 178); *see also Lustre Oil Co. LLC v. Anadarko Mins., Inc.*, 527 P.3d 586, 590-91 (Mont. 2023).

[134] *Great Plains Lending*, 259 A.3d at 1142.

CRNA provides its member tribes' citizens with medical, dental, and behavioral health services including optometry, physical therapy, alcohol and substance abuse-related services, senior services, and other services to educate and promote better health. CRNA delivers these healthcare services pursuant to ISDEAA, a federal law designed to promote tribal self-governance and self-determination.[135] As amici Arctic Village Council and five tribal consortia explain, CRNA's member tribes chose to exercise their sovereign authority "to create their own governance and service delivery solutions that reflect their own cultures, circumstances, priorities, and needs." Instead of providing the services themselves, CRNA's member tribes chose to act collectively and provide those services through CRNA. Under the circumstances, this factor weighs heavily in favor of immunity because of the close relationship between CRNA's purpose and the goal of self-governance.

### b. Method of creation

The method of creation factor tends to focus on the law under which the entity was formed.[136] Formation under tribal law may weigh in favor of immunity, whereas formation under state law may weigh against immunity.[137] The circumstances leading to, and the purpose driving, the entity's formation are also relevant; the creation of an entity by a tribe weighs in favor of immunity, but a tribe's absorption of an already

---

[135] *See* 25 U.S.C. § 5302 (explaining purposes of ISDEAA); *id.* § 5381(b) (defining "inter-tribal consortium" as analogous to "Indian tribe" for purposes of ISDEAA).

[136] *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1191-92 (10th Cir. 2010); *Miami Nation*, 386 P.3d at 372; *Williams*, 929 F.3d at 177-78; *Great Plains Lending*, 259 A.3d at 1143.

[137] *Breakthrough*, 629 F.3d at 1191-92; *Miami Nation*, 386 P.3d at 372; *Williams*, 929 F.3d at 177-78; *Great Plains Lending*, 259 A.3d at 1143.

operational non-tribal entity may weigh against immunity, especially if the absorbed entity is commercial.[138]

CRNA is a nonprofit entity incorporated under Alaska law, which is not alone dispositive but tends to weigh against sovereign immunity. But CRNA's sovereign member tribes created it as a nonprofit corporation to provide tribal services using tribal funds, and each tribe executed tribal resolutions authorizing CRNA to contract or compact on behalf of the tribes. CRNA was also created as "the historic successor" of "the traditional consultive and governing assembly of the Athabascan people of the Copper River Region." Therefore, while CRNA's incorporation under state law alone might tend to weigh against immunity, the circumstances and purpose underlying CRNA's formation favor immunity. We conclude this factor has a mixed impact on our determination of whether CRNA is an arm of its member tribes, slightly favoring immunity.

### c. Structure, ownership, management, and control

The control factor "examines the structure, ownership, and management of the entit[y], 'including the amount of control the Tribe has over the entit[y].' "[139] Relevant considerations include "the entit[y's] formal governance structure, the extent to which the entit[y] [is] owned by the tribe, and the day-to-day management of the entit[y]."[140] If a tribe lacks ownership or control of an entity, or if a tribe relinquishes

---

[138]    *Miami Nation*, 386 P.3d at 372; *Great Plains Lending*, 259 A.3d at 1143; *Williams*, 929 F.3d at 177; s*ee also Lustre Oil*, 527 P.3d at 604 (McKinnon, J., concurring) ("[T]he factor examining how an entity was created demands a more meaningful and substantive examination than just an observation that the incorporation occurred under state law.").

[139]    *Williams*, 929 F.3d at 182 (quoting *Breakthrough*, 629 F.3d at 1191).

[140]    *Id.*

its authority to non-sovereign entities, this factor will weigh against immunity.[141] Similarly, when multiple sovereigns join to create a wholly new entity, each sovereign may cede some of its sovereign authority; this may weigh against immunity to some extent.[142] But even when an entity is controlled by multiple tribes, this factor can still weigh in favor of immunity if the tribes retain significant control of the entity.[143]

Only federally recognized Alaska Native tribes that meet certain criteria are eligible for membership in CRNA. The member tribes retain significant control over CRNA's governance because each member tribe's council "elects or appoints a representative to CRNA's Board of Directors," and board members and officers must be Alaska Native, be enrolled in a member tribe, and physically reside in the Ahtna region. CRNA's bylaws provide that "[t]he affairs of the Corporation shall be governed by its board of directors." The number of board members is equal to the number of member tribes, so each sovereign shares its governing authority equally. No entity other than the tribes has any control. Although CRNA is a multi-sovereign entity, the structure of the organization, the requirements placed on directors and their

---

[141] *See Miami Nation*, 386 P.3d at 373; *Great Plains Lending*, 259 A.3d at 1145-46; *see also, e.g.*, *Williams*, 929 F.3d at 182-84.

[142] *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 42-44 (1994) (discussing possible effects on immunity and control when states enter into interstate compact).

[143] *See McCoy v. Salish Kootenai Coll., Inc.*, 334 F. Supp. 3d 1116, 1120-24 (D. Mont. 2018) (concluding tribal college is arm of Confederated Salish and Kootenai Tribes), *aff'd*, 785 F. App'x 414 (9th Cir. 2019); *Wilson v. Alaska Native Tribal Health Consortium*, 399 F. Supp. 3d 926, 933-37 (D. Alaska 2019) (concluding tribal health consortium is arm of multiple Alaska tribes); *Manzano v. S. Indian Health Council, Inc.*, No. 20-cv-02130-BAS-BGS, 2021 WL 2826072, at *8-10 (S.D. Cal. July 7, 2021) (concluding nonprofit tribal health council is arm of seven member tribes); *Cain v. Salish Kootenai Coll., Inc.*, No. CV-12-181-M-BMM, 2018 WL 2272792, at *1, *3-4 (D. Mont. May 17, 2018) (concluding tribal college is arm of multiple tribes).

appointment, and the degree of control each tribe retains all support immunity. We therefore conclude that this factor favors immunity.

### d.    Tribal intent

The intent factor "assesses the tribe's intent to extend its immunity to the entit[y]."[144] "In some cases, the tribal ordinances or articles of incorporation creating the entit[y] will state whether the tribe intended the entit[y] to share in the tribe's immunity."[145] The tribe creating an entity "is typically positioned to specify the terms of its creation or incorporation," so "this factor will generally weigh against immunity if the record is silent as to the tribe's intent."[146] But even without express statements, intent may still "be inferred from 'the tribe's actions or other sources.' "[147] The record before us does not indicate any express intent for CRNA to share the sovereign immunity of its member tribes. However, pursuant to ISDEAA, when "an Indian tribe has authorized . . . an inter-tribal consortium [like CRNA] . . . to plan for or carry out programs, services, functions, or activities . . . on its behalf . . . the . . . inter-tribal consortium . . . shall have the rights and responsibilities of the authorizing Indian tribe."[148]

We express no view on whether ISDEAA could confer sovereign immunity to a consortium as a matter of federal statutory law. But we do consider a tribe's authorization of an entity to carry out important governmental functions under

---

[144]    *Williams*, 929 F.3d at 184.

[145]    *Id.*

[146]    *Miami Nation*, 386 P.3d at 372.

[147]    *Great Plains Lending, LLC v. Dep't of Banking*, 259 A.3d 1128, 1146 (Conn. 2021) (quoting *Miami Nation*, 386 P.3d at 372).

[148]    25 U.S.C. § 5381(b).

ISDEAA relevant to determining tribal intent.[149]   When CRNA's member tribes authorized CRNA to carry out services on their behalf under ISDEAA, they manifested their intent to share their sovereign rights and responsibilities with CRNA, including sovereign immunity.[150]   Taking action under ISDEAA directly supports the federal policies underlying sovereign immunity, namely tribal self-governance, self-sufficiency, and cultural autonomy.

Similarly, CRNA's incorporation articles express an intent that CRNA "have all the rights, duties, powers and privileges of" the tribes' historical Chief's Conference.   This, at a minimum, supports an implicit intent to extend immunity to CRNA.   Thus, despite the lack of express tribal intent, we conclude that this factor favors immunity.

###### e.    Financial relationship

This final factor examines the financial relationship between the entity and the tribe.[151]   One relevant consideration is "whether a judgment against an entity would reach the tribe's assets."[152]   Financial insulation remains an important aspect of the inquiry because protecting tribal assets is "crucial to the advancement of the federal

---

**149**    *See, e.g.*, *Wilson v. Alaska Native Tribal Health Consortium*, 399 F. Supp. 3d 926, 935 (D. Alaska 2019) (using fact that inter-tribal healthcare consortium was created under ISDEAA as evidence that tribe did not intend to waive its sovereign immunity).

**150**    *Cf. id.;* s*ee also Memphis Biofuels, LLC v. Chickasaw Nation Indus., Inc.*, 585 F.3d 917, 920-21 (6th Cir. 2009) (holding that tribe's incorporation under Indian Reorganization Act did not divest subsequent entity of immunity due to general principle that abrogation of tribal sovereign immunity must be clear and may not be implied).

**151**    *Great Plains Lending*, 259 A.3d at 1147; *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 184 (4th Cir. 2019); *Miami Nation*, 386 P.3d at 373.

**152**    *Williams*, 929 F.3d at 184.

policies advanced by immunity."[153] But we no longer consider formal financial insulation predominant or dispositive. Other relevant considerations include how much revenue the entity provides for the tribe, the practical effect on the tribe of a judgment against the entity, and the source of the entity's funding.[154] This factor will weigh in favor of immunity if the tribe depends significantly on the entity's revenue, if a judgment against the entity would have a substantial impact on tribal treasuries,[155] or if the entity receives funds that would otherwise flow to tribes to provide tribal services. Like the Connecticut Supreme Court, "we decline to require a sovereign to provide detailed information about the extent to which an entity supports its budget."[156] "But because any imposition of liability on a tribally affiliated entity could theoretically impact tribal finances, the entity must do more than simply assert that it generates some revenue for the tribe in order to tilt this factor in favor of immunity."[157] We warn courts, however, not to rely too heavily on whether the entity serves as a successful business venture for the tribe as it may result in the conclusion that fledgling business entities

---

[153]     *Douglas Indian Ass'n v. Cent. Council of Tlingit & Haida Indian Tribes of Alaska*, 403 P.3d 1172, 1179 (Alaska 2017) (quoting *Runyon ex rel. B.R. v. Ass'n of Vill. Council Presidents*, 84 P.3d 437, 440 (Alaska 2004)); *cf. Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994) (explaining that protecting state treasuries from judgments was "the impetus for the Eleventh Amendment").

[154]     *Williams*, 929 F.3d at 184; *Great Plains Lending*, 259 A.3d at 1147-48; *Miami Nation*, 386 P.3d at 373-74.

[155]     *Williams*, 929 F.3d at 184; *Great Plains Lending*, 259 A.3d at 1147; *Miami Nation*, 386 P.3d at 373-74.

[156]     *Great Plains Lending*, 259 A.3d at 1148.

[157]     *Miami Nation*, 386 P.3d at 373-74.

without a steady revenue stream are less deserving of immunity than established ventures.[158]

As previously noted, CRNA is formally financially insulated from its member tribes because it is an Alaska nonprofit corporation.[159] Formal financial insulation weighs against immunity. But as the chair of CRNA's board of directors explained, "CRNA's budget is substantially based on federal funds provided to benefit its member Tribes and their Tribal members." These funds are intended for member tribes, and the tribes passed tribal resolutions that authorize CRNA to receive the funds instead and provide services on the tribes' behalf. Further, CRNA avers that a judgment against it would "have a direct and severe financial impact" on its ability to provide these services. While the severity of any such impact would depend on the amount of the judgment relative to overall funding, we note that if a damages award were imposed, it would be effectively paid from the member tribes' federal healthcare funding. We note too CRNA's assertion that "[t]his lawsuit has already required CRNA to expend resources that it would otherwise use to support" healthcare services for tribal members. The superior court agreed that "tribes' funds that would otherwise be used to provide for healthcare for tribal members would be at risk in the event of an adverse judgment."

While CRNA is formally financially insulated from its member tribes, CRNA's financial resources substantially flow from its member tribes' federal funds via tribal resolutions. Any judgment against CRNA would be paid from the tribes' federal healthcare funding. This would directly affect CRNA's resources and ability to

---

[158] *Great Plains Lending*, 259 A.3d at 1142 (noting that relying improperly on financial inquiry may overlook or underestimate certain business ventures' value to tribe, particularly for vulnerable fledgling businesses, and that inquiring too deeply into tribal finances could lead to improper incursion into financial affairs of coordinate sovereign).

[159] *See* AS 10.20.051(b).

provide services to tribal members, and undermine the policies of self-determination and self-governance. We therefore conclude that this factor favors immunity.

### f. Overall analysis

Considering the factors together, although some have a mixed impact on our analysis, we are convinced by the balance of factors that CRNA is entitled to tribal sovereign immunity as an arm of its member tribes.[160] Although no single factor is dispositive, here the purpose factor strongly favors immunity because CRNA's member tribes use it to deliver tribal healthcare services, a core tribal governmental function necessarily connected to tribal self-governance and autonomy. Further, CRNA's member tribes manifested their intent that the organization remain closely linked to the tribes by empowering CRNA to carry out healthcare services for tribal members, authorizing it to receive federal funding on the tribes' behalf, intertwining tribal financial resources via tribal resolutions, and creating a governance structure of an elected board of tribal representatives that gives the tribes close control over CRNA's activities. We therefore conclude that CRNA is an arm of its member tribes and entitled to tribal sovereign immunity.

### 4. CRNA did not waive its sovereign immunity.

Having determined that CRNA is entitled to tribal sovereign immunity as an arm of its member tribes, we turn to analyzing whether CRNA's member tribes have waived that sovereign immunity and we conclude that they have not. Tribal waiver of sovereign immunity must be unequivocally expressed; such waiver may not be implied.[161] In incorporating under the Alaska Nonprofit Corporation Act, CRNA's

---

[160]    Because this conclusion is dispositive, we do not address CRNA's other argument that it is entitled to sovereign immunity as a matter of federal statutory law.

[161]    *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978) (holding waiver of tribal sovereign immunity must be unequivocally expressed); *Douglas Indian Ass'n v Cent. Council of Tlingit & Haida Indian Tribes of Alaska*, 403 P.3d 1172, 1178

member tribes did not clearly articulate any waiver of sovereign immunity for CRNA's activities. We are mindful of the Alaska Nonprofit Corporation Act's provision that "[a] corporation may . . . sue and be sued, complain and defend, in its corporate name."[162] Mere incorporation under Alaska law, however, cannot waive sovereign immunity, which "is a matter of federal law and is not subject to diminution by the States."[163]

Moreover, the Alaska Nonprofit Corporation Act's permissive "sue and be sued" clause alone cannot waive CRNA's sovereign immunity as an arm of its member tribes.[164] It is not an unequivocal expression of the member tribes' intent to waive CRNA's sovereign immunity. Rather, the Alaska Nonprofit Corporation Act's "sue and be sued" clause is part of a list of general powers that a nonprofit *may* take, subject to other applicable law and regulations.[165] This permissive grant of a general

---

n.32 (Alaska 2017) ("[A] waiver of tribal sovereign immunity may not be implied."); *see also Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 403 (2023) (Gorsuch, J., dissenting) ("It is, after all 'inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent*.' " (quoting THE FEDERALIST NO. 81, at 487 (A. Hamilton) (C. Rossiter ed., 1961))).

[162] AS 10.20.011(2).

[163] *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 789 (2014) (quoting *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 756 (1998)).

[164] *See, e.g.*, *Linneen v. Gila River Indian Cmty.*, 276 F.3d 489, 492 (9th Cir. 2002) ("Such 'sue and be sued' clauses waive immunity with respect to a tribe's corporate activities, but not with respect to its governmental activities."); *Barron v. Alaska Native Tribal Health Consortium*, 373 F. Supp. 3d 1232, 1241-42 (D. Alaska 2019) (finding tribal health consortium nonprofit held sovereign immunity and did not waive it); *Manzano v. S. Indian Health Council*, No. 20-cv-02130-BAS-BGS, 2021 WL 2826072, at *12 (S.D. Cal. July 7, 2021) ("[T]ribal organizations do not waive sovereign immunity merely by incorporating under state law.").

[165] *Compare Parker Drilling Co. v. Metlakatla Indian Cmty.*, 451 F. Supp. 1127, 1136 (D. Alaska 1978) (concluding "sue and be sued" clause in tribe's corporate charter waived sovereign immunity in tort where evidence suggested tribe included

state power is in no way an *unequivocal* statement by CRNA's member tribes of their intent to waive CRNA's sovereign immunity.[166]

Our reasoning is consistent with the well-recognized principle that a tribe's compliance, or agreement to comply, with a particular state law does not amount to an unequivocal waiver of that tribe's sovereign immunity.[167] Merely agreeing to

---

clause in charter with understanding that it would waive sovereign immunity), *with Linneen*, 276 F.3d at 492-93 (concluding "sue and be sued" clause in tribe's corporate charter "waive[d] immunity with respect to a tribe's corporate activities, but not with respect to its governmental activities" and concluding no waiver had been established "because the alleged actions that form the basis of this suit are clearly governmental rather than corporate in nature").

[166]    *Cf. Lustre Oil Co. LLC v. Anadarko Mins Inc.*, 527 P.3d 586, 590-93 (Mont. 2023) (rejecting argument that incorporation under state law alone is controlling, but holding involved tribes' clear documentation of intent to treat corporate entity as separate entity not sharing in sovereign immunity to be decisive).

[167]    *See, e.g.*, *Allen v. Gold Country Casino*, 464 F.3d 1044, 1047 (9th Cir. 2006) (holding arm of tribe did not waive sovereign immunity through providing an employment application and orientation booklet that stated it would comply with state and federal employment and antidiscrimination laws); *Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1044 n.2 (8th Cir. 2000) (holding arm of tribe did not "waive its immunity by executing a certificate of assurance with the Department of Health and Human Services in which it agreed to abide by Title VI of the Civil Rights Act of 1964"); *Nanomantube v. Kickapoo Tribe in Kan.*, 631 F.3d 1150, 1153 (10th Cir. 2011) ("Tribe's agreement to comply with Title VII" of the Civil Rights Act of 1964 did not constitute "unequivocal waiver of tribal sovereign immunity."); *Sanderlin v. Seminole Tribe of Fla.*, 243 F.3d 1282, 1289 (11th Cir. 2001) (holding tribe's contractual promise to comply with anti-discrimination provision of Rehabilitation Act did not constitute "express and unequivocal waiver of sovereign immunity"); *Wis. Dep't of Nat. Res. v. Timber & Wood Prods.*, 906 N.W.2d 707, 714-16 (Wis. 2017) (concluding tribe's compliance with Forest Croplands Law did not amount to consent to be sued in enforcement of law); *Sheffer v. Buffalo Run Casino, PTE, Inc.*, 315 P.3d 359, 371 (Okla. 2013) (holding tribe did not waive sovereign immunity by applying for and accepting liquor license); *Cohen v. Little Six, Inc.*, 543 N.W.2d 376, 380 (Minn. App. 1996) (deciding tribal corporation did not waive sovereign immunity by registering as foreign corporation and agreeing to be "subject to the laws of [Minnesota]"), *aff'd,* 561 N.W.2d 889 (Minn. 1997).

comply with a law does not approach the requirement of an explicit waiver of immunity.[168]  And as noted by a justice concurring in the Montana Supreme Court's decision in *Lustre Oil*, while we appreciate the distinction between creation of an entity under state law and an entity's agreement to follow state law, we do not view this distinction as "worthy of establishing a rule of automatic waiver, particularly given the requirement . . . that any waiver must be express and unequivocal."[169]

Consideration of whether a tribe has clearly and unequivocally waived its sovereign immunity requires more than a review of the statute or law under which an entity is formed by one or more tribes.  That statute or law is one piece of information that may inform the analysis.  But to discern whether a tribe has clearly and unequivocally waived immunity, it is crucial to understand the tribe's intent.  And such understanding requires full consideration of a tribe's own expression of its intent, as well as contextual information that reflects the tribe's intentions.  For instance here, CRNA's articles of incorporation indicate the member tribes' intent that CRNA "have all the rights, duties, powers and privileges" as the historic successor of the Chief's Conference — the Copper River Region Athabascan people's consulting and governing assembly from time immemorial.[170]  This, along with CRNA's authorization under ISDEAA to carry out services on its member tribes' behalf, indicates the tribes' intent to share with CRNA their sovereign rights and responsibilities, including sovereign

---

[168]   *See Allen v. Gold Country Casino*, 464 F.3d 1044, 1047 (9th Cir. 2006) (concluding tribe's arm's statements agreeing to comply with state and federal employment law "did not approach these explicit waivers of immunity from suit; the statements' references to federal law did not mention court enforcement, suing or being sued, or any other phrase clearly contemplating suits against the" tribe).

[169]   527 P.3d at 606 (McKinnon, J., concurring).

[170]   This statement indicates the tribes' intent but is not sufficiently clear and express on the question of sovereign immunity and waiver to be dispositive alone.

immunity. We therefore conclude that CRNA's member tribes have not waived CRNA's arm-of-the-tribe immunity.

Having determined that CRNA is entitled to sovereign immunity as an arm of its member tribes, and that its member tribes have not waived that immunity, we hold that CRNA is immune from suit.

## V. CONCLUSION

For the reasons set forth above, we AFFIRM the superior court's order dismissing Ito's complaint.

MATTHEWS, Senior Justice, dissenting.

**INTRODUCTION**

In *Runyon ex rel. B.R. v. Ass'n of Village Council Presidents*[1] we held that a tribally owned nonprofit corporation chartered under Alaska law did not have tribal immunity because its status as a corporation — regardless of the jurisdiction in which it was chartered — insulated its owner-tribes' assets from compulsory seizure. Today's opinion overrules *Runyon* and reaches the opposite conclusion that a similarly owned and organized Alaska corporation does have tribal immunity. The opinion also concludes that this new result will do more good than harm.

In my view there is no need in this case to reconsider the rationale of *Runyon* because its holding can be fully supported on a narrower ground. Corporations formed under Alaska law cannot have tribal immunity because they are legally distinct from their tribal owners and Alaska law requires that they be amenable to suit. On this basis the holding of *Runyon* can be reconfirmed insofar as it applies to Alaska corporations.

I also believe that the court's more-good-than-harm conclusion is plainly wrong. As a result of today's opinion contracts formed in the legal environment created by *Runyon* will not be enforceable, the state's ability to protect the public will be severely limited, and thousands of Alaska workers will lose their rights.

One additional harm must be noted lest we lose sight of the immediacy of this case in the magnitude of its collateral consequences: Yvonne Ito has lost a valuable property right — her right to sue CRNA on a presumptively valid claim of breach of contract.[2]

---

[1]    84 P.3d 437 (Alaska 2004).

[2]    Pretrial dismissals of a complaint are reviewed de novo, "deeming all facts in the complaint true and provable." *Guerrero v. Alaska Hous. Fin. Corp.*, 6 P.3d 250, 253 (Alaska 2000); *see also Evans v. McKay*, 869 F.2d 1341, 1344 (9th Cir. 1989).

**TRIBALLY OWNED ALASKA CORPORATIONS ARE SUBJECT TO SUIT**

In *Somerlott v. Cherokee Nation Distributors, Inc.*, the 10th Circuit ruled that a wholly-owned subsidiary of a tribal entity did not have sovereign immunity because it was incorporated under Oklahoma law which permits suits against Oklahoma corporations.[3] This ruling was made as a threshold matter. The court ruled that its six-factor test for determining the tribal immunity of subsidiary tribal organizations does not apply to

> entities which are legally distinct from their members and which voluntarily subject themselves to the authority of another sovereign which allows them to be sued. *See* Okla. Stat. tit. 18, . . . § 2003 (1) ("[A] limited liability company may . . . [s]ue, be sued, complain and defend in all courts . . . .").[4]

CRNA as an Alaska nonprofit corporation is legally distinct from its members and is amenable to suit under state law.[5] It therefore meets the *Somerlott* criteria.[6] In my view we should follow *Somerlott* and hold that CRNA may not assert sovereign immunity.

*Somerlott* has been applied to a tribally owned nonprofit corporation from Alaska. In *Eaglesun Systems Products, Inc. v. Ass'n of Village Council Presidents*, the court held that AVCP was amenable to suit on a contract claim.[7] Rejecting the

---

**3** 686 F.3d 1144, 1149-50 (10th Cir. 2012).

**4** *Id.* (third and fourth alterations in original).

**5** The members of an Alaska nonprofit corporation "are not . . . liable on [the corporation's] obligations." AS 10.20.051(b). An Alaska nonprofit corporation "may . . . sue and be sued, complain and defend, in its corporate name." AS 10.20.011(2). Even if a "sue and be sued" clause is not included in corporate articles, one is deemed present as a matter of law. *See* AS 10.20.151(b).

**6** The *Somerlott* criteria do not include, either textually or logically, a requirement that the subsidiary corporation be for-profit in character.

**7** No. 13-CV-0438-CVE-PJC, 2014 WL 1119726, at *7-9 (N.D. Okla. 2014).

corporation's claim that it was immune because its services were governmental, the court stated, "[T]he mere fact that AVCP provides services that could also be provided by a government does not give AVCP sovereign immunity from suit."[8] Citing *Somerlott* the court continued, "The [multi-factor] subordinate economic entity test is inapplicable to entities organized under state law, because such entities are under the authority of the state under which they are incorporated, not an Indian tribe."[9]

At least two states have accepted the *Somerlott* approach. In *Wright v. Colville Tribal Enterprise Corp.*, the Washington Supreme Court anticipated the *Somerlott* rationale, stating that a tribe "may waive the immunity of a tribal enterprise by incorporating the enterprise under state law, rather than tribal law."[10] Referring to the result reached in *Runyon*, the Washington court stated, "For example, tribal sovereign immunity did not protect 'a nonprofit Alaska corporation consisting of fifty-six Alaska Native Villages' . . . . [T]he Alaska tribes waived immunity by incorporating the tribal enterprise in question under Alaska law . . . ."[11] In *State v. Cherokee Services Group, LLC*, the North Dakota Supreme Court accepted *Somerlott*: "When a tribal entity subjects itself to a state by organizing under the state's laws, it waives sovereign immunity."[12]

Adopting the *Somerlott* approach would not require overruling *Runyon.* As already stated, *Runyon* held that a tribal consortium organized under the Alaska Nonprofit Corporation Act could not share in the immunity of its tribal members

---

[8]     *Id.* at *7.

[9]     *Id.* at *8.

[10]     147 P.3d 1275, 1280 (Wash. 2006).

[11]     *Id.* (quoting *Runyon ex rel. B.R. v. Ass'n of Vill. Council Presidents*, 84 P.3d 437, 438 (Alaska 2004)).

[12]     955 N.W.2d 67, 73 (N.D. 2021) (citing *Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d 1144, 1149-50 (10th Cir. 2012)).

because the financial insulation afforded by its corporate structure provided sufficient protection of member tribal assets and thus immunity for the consortium itself was not required.[13] Under *Somerlott* the validity of this rationale need not be revisited. Corporations formed under Alaska law still, as in *Runyon*, would be precluded from claiming immunity, even though corporations formed under federal or tribal law might not be.[14] Because *Runyon* does not need to be overruled if we follow *Somerlott*, the principle of stare decisis strongly counsels that we do so.

*Somerlott*'s holding that tribally owned corporations do not have sovereign immunity if they are separate entities formed under state laws that allow them to be sued is well supported and logical. The *Somerlott* court drew an analogy between the sovereign immunity of tribes and that of the United States and observed that when the latter incorporates sub-entities under state law the newly created entities do not share in the immunity of the United States.[15] The venerable nature of the underlying principle is illustrated by the following quote from Chief Justice Marshall in *Bank of the United States v. Planters' Bank of Georgia*:

> The suit is against a corporation, and the judgment is to be satisfied by the property of the corporation . . . . The

---

[13]     *Runyon*, 84 P.3d at 441.

[14]     This does not mean that the financial insulation rationale of *Runyon* is indefensible. *Runyon* was cited with approval in *Sue/Perior Concrete & Paving, Inc. v. Lewiston Golf Course Corp.*, 25 N.E.3d 928, 935-36 (N.Y. 2014). The court gave primary importance to the financial insulation rationale, concluding that a tribally owned corporation organized under tribal law was not immune: "If a judgment against a corporation created by an Indian tribe will not reach the tribe's assets, because the corporation lacks 'the power to bind or obligate the funds of the tribe,' then the corporation is not an 'arm' of the tribe." *Id.* at 935 (quoting *Ransom v. St. Regis Mohawk Educ. & Cmty. Fund, Inc.*, 658 N.E.2d 989, 992 (N.Y. 1995)). The rationale of *Somerlott*, however, seems more likely to be ultimately adopted by the U.S. Supreme Court than that of *Runyon*.

[15]     *Somerlott*, 686 F.3d at 1150 (citing *Panama R. Co. v. Curran*, 256 F. 768, 771-72 (5th Cir. 1919); *Salas v. United States*, 234 F. 842, 844-45 (2d Cir. 1916)).

Planters' Bank of Georgia is not the State of Georgia, although the State holds an interest in it.

It is, we think, a sound principle, that when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted. Thus, many States of this Union who have an interest in Banks, are not suable even in their own Courts; yet they never exempt the corporation from being sued. *The State of Georgia, by giving to the Bank the capacity to sue and be sued, voluntarily strips itself of its sovereign character, so far as respects the transactions of the Bank, and waives all the privileges of that character. As a member of a corporation, a government never exercises its sovereignty. It acts merely as a corporator, and exercises no other powers in the management of the affairs of the corporation, than are expressly given by the incorporating act.*[16]

Then-Judge Gorsuch expanded on this theme in a concurring opinion in *Somerlott*. Referring to situations where other sovereigns — the federal government or foreign states — incorporate under state law he observed: "So if (as here) the state in question conditions the privilege of creating a corporate entity under its laws on an agreement the new entity will be amenable to suit, that condition must be respected even when the incorporator is the federal government. One sovereign, after all, cannot usually rewrite the laws of another."[17]

---

[16] 22 U.S. (9 Wheat) 904, 907-08 (1824) (emphasis added), *quoted in Panama R. Co.*, 256 F. at 772.

[17] *Somerlott*, 686 F.3d at 1154-55 (Gorsuch, J., concurring). These reasons apply as readily to nonprofit corporations as they do to corporations having a for-profit character. They also make clear that amenability to suit is a corporate characteristic

The *Somerlott* approach is thus founded on considerations of respect for state sovereignty, the authority of a state over corporations that are formed under its laws, the fact that state-formed corporations are legally distinct from their members or owners, the policy of state corporate laws that entities created by them be responsible, albeit artificial, beings, and the inability of incorporators to change the laws which they choose to utilize.

These and similar factors led the North Dakota Supreme Court to conclude in *Airvator, Inc. v. Turtle Mountain Manufacturing Co.* that it had jurisdiction over a state-chartered corporation that was controlled by a Tribe and was doing business on an Indian reservation.[18]  Because North Dakota, unlike Alaska, was an optional and not a mandatory Public Law 280 state, the critical question was whether the corporation was an "Indian" for jurisdictional purposes.[19]  The court held that it was not and therefore it was subject to the jurisdiction of the state.[20]  The court began its discussion by accepting the views expressed by a leading commentator that while tribally chartered corporations controlled by Indians should be treated as Indians, "[s]tate chartered corporations, being fictional persons created by the states, should be treated as non-Indians, even if owned by Indians."[21]

---

prescribed by state law.  It does not depend on the outcome of a traditional waiver inquiry as to whether a given form of expression is clear or ambiguous.

[18]     329 N.W.2d 596, 604 (N.D. 1983).

[19]     *Id.* at 599-600; *see also id.* at 599 n.3 (noting that Congress delegated to Alaska "jurisdiction over Indian lands within its boundaries" (citing Act of August 8, 1958, Pub. L. No. 85-615, § 1, 72 Stat. 545, as amended by Act of November 25, 1970, Pub. L. No. 91-523 § 1, 84 Stat. 1358)).

[20]     *Id.* at 604.

[21]     FELIX S. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 355-56 (Rennard Strickland ed., 1982) (hereinafter COHEN'S 1982), *quoted in Airvator, Inc.*, 329 N.W.2d at 602.

The court went on to observe:

> A corporation cannot exist without the consent or grant of the sovereign and the power to create a corporation is one of the attributes of sovereignty. The state has plenary power and authority over corporations.
>
> . . . .
>
> . . . In essence, a corporation is recognized and permitted to do business subject to the terms the Legislature may impose.
>
> . . . .
>
> . . . [E]ach corporation has the power to sue and be sued, complain, and defend in its corporate name. Additionally, a corporation has the power to have perpetual existence and to elect or appoint officers and agents of the corporation.
>
> . . . .
>
> . . . [T]hese statutes and authorities lend support to the principle that a corporation is an entity distinct and separate from its shareholders, directors, officers, and agents.
>
> . . . .
>
> Because it is a distinct entity, a corporation, for purposes of jurisdiction, is a citizen of and is subject to the jurisdiction of the courts of the state in which it is incorporated. For purposes of jurisdiction, the citizenship of the shareholders, directors, officers and agents has little influence with regard to the citizenship of a corporation. Neither do we believe the status of the stockholders, directors, officers, or agents, as Indians or non-Indians have, in this instance, any influence with regard to the status of the state-incorporated corporation as an "Indian" or "non-Indian." To give credence to the status of individual shareholders would overlook the general theory of corporations relative to their status as a distinct entity. [22]

---

[22]  *Airvator, Inc.*, 329 N.W.2d at 603-04 (citations omitted).

A principle based on Supreme Court case law also lends support to the *Somerlott* approach. This is that Indians are generally governed in their conduct outside of Indian country by state law that is applicable to all citizens: "Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State."[23] Relatedly, the Court has also indicated that Indian law does not confer "supersovereign authority to interfere with another jurisdiction's" traditional exercise of sovereign rights.[24]

These concepts suggest that immunity should not be extended to tribally owned corporations formed under state law. The creation of state corporations is an exercise of state sovereignty, as is setting the terms and conditions under which such corporations may function. Corporations are distinct from their owners, and the incorporating state has a strong interest in ensuring that the artificial persons it permits to exist be responsible and accountable. Holding that a tribally owned corporation formed under state law is immune from suit would bestow on its incorporators supersovereign authority that would override the traditional role of a state over corporations formed under its laws. Doing so would not only supersede supervisory state authority, it would mean that tribes can change the laws under which state corporations are governed, and that tribally owned state corporations would thus be subject to special rules, rather than being governed by nondiscriminatory state laws applicable to all citizens.

The following additional authorities lend support to the principle that tribally owned corporations organized under state laws like the Alaska Nonprofit Corporation Act do not have sovereign immunity.

---

[23] *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49 (1973).

[24] *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 466 (1995).

— By extensive and longstanding practice, when Congress creates government corporations that it intends to be amenable to suit it does so through the use of "sue and be sued" clauses. In *Keifer & Keifer v. Reconstruction Finance Corp.*, the Court held that the purview of a "sue and be sued" clause in a statute creating a government corporation embraced a claim for negligent care of livestock.[25] Regardless of whether the claim sounded in tort or contract, it was within the "scope of liability implicit in the general authority [Congress] has conferred on governmental corporations to sue and be sued."[26] Noting the extensive use of corporations for government ends, the court observed, "In spawning these corporations during the past two decades, Congress has uniformly included amenability to law. Congress has provided for not less than forty of such corporations discharging governmental functions, and without exception the authority to sue and be sued was included."[27]

— In enacting the Alaska Native Claims Settlement Act[28] Congress sought to ensure that the Native corporations that were to receive land and money under the act would not have tribal sovereign immunity.[29] To this end ANCSA required that

---

[25] 306 U.S. 381, 394-95 (1939).

[26] *Id.* at 397.

[27] *Id.* at 390; *see also, e.g.*, *Fed. Hous. Admin. v. Burr*, 309 U.S. 242, 245 (1940) ("Clearly the words 'sue and be sued' in their normal connotation embrace all civil process incident to the commencement or continuance of legal proceedings."); *Franchise Tax Bd. of Cal. v. U. S. Postal Serv.*, 467 U.S. 512 (1984) (sue and be sued clause waives immunity from suit and administrative proceedings); *Thacker v. Tenn. Valley Auth.*, 139 S. Ct. 1435 (2019) (sue and be sued clause waives sovereign immunity subject to implied exception for grave interference with governmental function).

[28] 43 U.S.C. § 1601 et seq.

[29] *Cf. Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 532-33 (1998) (noting that "ANCSA transferred reservation lands to private, state-chartered Native corporations, . . . with the goal of avoiding 'any permanent, racially defined institutions, rights, privileges, or obligations' " (quoting 43 U.S.C. § 1601(b))).

Village corporations that are to receive benefits be either for-profit or nonprofit corporations formed under Alaska law.[30] This requirement reflects an assumption on the part of Congress that tribal sovereignty is incompatible with corporate status under Alaska law and that requiring Village corporations to have such status prevents them from asserting "permanent, racially defined . . . rights [or] privileges."[31] The proposition assumed by Congress in ANCSA that Alaska corporate status would be incompatible with tribal status was also reflected and shared by the D.C. Circuit Court of Appeals and the U.S. Supreme Court in recent decisions: "ANCSA terminated 22 of the 23 existing reservations in Alaska, extinguished all aboriginal land claims of Native individuals or tribes, and transferred settlement proceeds not to the Native villages previously thought to have at least arguable sovereignty, but to newly-created corporations chartered under and *thus subject to Alaska law*."[32] "A federally recognized

---

[30] 43 U.S.C. § 1607(a) provides: "The Native residents of each Native village entitled to receive lands and benefits under this chapter shall organize as a business for profit or nonprofit corporation under the laws of the State before the Native village may receive patent to lands or benefits under this chapter . . . ."

[31] 43 U.S.C. § 1601(b). The validity of Congress's assumption in structuring ANCSA as it did in 1976 is supported by Felix S. Cohen's Handbook of Federal Indian Law: "State chartered corporations, being fictional persons created by states, should be treated as non-Indians even if owned by Indians." COHEN'S 1982, *supra* note 21, at 355-56. It is also supported by case law. In *Airvator, Inc. v. Turtle Mountain Mfg. Co*, the court was presented with a case where the BIA and the U.S. Department of Commerce had insisted that an Indian-controlled corporation be incorporated under state law as a condition of receiving a loan and grant. 329 N.W. 2d 596, 597 (N.D. 1983). The court held that this indeed rendered the corporation subject to state jurisdiction, stating, "We must assume the federal government was aware that any corporation formed and created, which is registered with the Secretary of State and exists in accordance with and pursuant to state law, is subject to the jurisdiction of th[e] state." *Id.* at 604.

[32] *Confederated Tribes of the Chehalis Reserv. v. Mnuchin*, 976 F.3d 15, 26 (D.C. Circ. 2020) (emphasis added) (first citing 43 U.S.C. § 1618(a); then citing *id.* § 1603; and then citing *id.* §§ 1605(e), 1606(d)), *rev'd on other grounds sub nom. Yellen v. Confederated Tribes of the Chehalis Reserv.*, 114 S.C. 2434 (2021).

tribe is one that has entered into 'a government-to-government relationship [with] the United States.' . . . *As private companies incorporated under state law*, [ANCSA regional and village corporations] have never been 'recognized' by the United States in this sovereign political sense."[33]  The assumption of incompatibility between state corporate status and sovereign tribal status that is shared here by Congress, the D.C. Circuit, and the U.S. Supreme Court is wholly consistent with *Somerlott*.

— Other provisions of the Alaska Nonprofit Corporation Act are also incompatible with a claim that corporations organized under that act are tribal sovereigns.  For example, a member of a corporation may bring an action in superior court to liquidate the corporation for various reasons including that the acts of those in charge of the corporation are "illegal, oppressive, or fraudulent" or that "corporate assets are being misapplied or wasted."[34]  Creditors who hold unsatisfied judgments or writings admitting that a claim is due may sue in superior court to liquidate a corporation on the grounds of insolvency.[35]  The superior court has broad power over corporate liquidation proceedings including appointing receivers to carry on corporate business pending litigation and to sell or otherwise dispose of assets.[36]  When the superior court appoints a receiver it has exclusive jurisdiction of the corporation and its property, wherever situated.[37]  Further, each corporation must file biennial reports stating, among other things, the names and addresses of its directors and officers, and

---

[33]     *Yellen*, 114 S.C. at 2440 (emphasis added) (quoting COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 3.02[3] (Nell Jessup Newton ed., 2012)) (hereinafter COHEN'S 2012).

[34]     AS 10.20.360, .355.

[35]     AS 10.20.365, .355.

[36]     AS 10.20.385, .390, .395, .410.

[37]     AS 10.20.415.

the real and personal property assets of the corporation.[38] When the directors or officers change, the report must be updated.[39] Failure to comply with these requirements is grounds for involuntary dissolution by the Commissioner of the Department of Commerce, Community, and Economic Development.[40] Because tribal sovereign immunity means that "tribes are immune from lawsuits or court process . . . unless 'Congress has authorized the suit or the tribe has waived its immunity,' "[41] these provisions, subjecting Alaska nonprofit corporations to lawsuits and administrative proceedings, conflict with the core concept of the immunity asserted in this case.

Based on the above reasons and authorities CRNA's status as an Alaska nonprofit corporation precludes its claim of tribal sovereign immunity.

## THE COURT'S MORE GOOD THAN HARM CONCLUSION IS ERRONEOUS

### Background

Until now tribal immunity has not been of great consequence in Alaska. There are several reasons for this.

Until 1993 whether the numerous Native Villages in Alaska were actually tribes in the sense of being sovereign political entities was both uncertain and disputed. In 1988 in *Native Village of Stevens v. Alaska Management & Planning*[42] we held that they were not tribes because, among other reasons, they had not been federally

---

[38] AS 10.20.620, .630.

[39] AS 10.20.631.

[40] AS 10.20.325.

[41] COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 7.05, at 636 (Nell Jessup Newton ed., 2012) (quoting *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998)); *see also Puyallup Tribe, Inc. v. Dep't of Game of Wash.*, 433 U.S. 165, 172 (1977) ("Absent an effective waiver or consent, it is settled that a state court may not exercise jurisdiction over a recognized Indian tribe.").

[42] 757 P.2d 32 (Alaska 1988).

recognized as such.[43]  But in 1993 the Department of the Interior formally recognized 226 Alaska Native Villages as having tribal status.[44]  This mooted *Native Village of Stevens*, and the tribal status of Alaska Native Villages is now undisputed.[45]

Although as of 1993 there were 226 sovereign tribes in Alaska, they were not economically powerful.  In resolving Alaska Natives' land claims in 1971 Congress bestowed large grants of land and money on regional and village corporations organized under state law, not on the village organizations that later were recognized as tribes.[46] Congress did not want the significant assets transferred under ANCSA to be owned by organizations that were not fully responsible constituents of the State of Alaska. Congress expressly decried "establishing any permanent racially defined institutions, rights, privileges, or obligations" or a "reservation system or lengthy wardship or trusteeship."[47]

The source of the economic power that CRNA and the numerous other Alaska tribally owned nonprofit corporations currently have is the Indian Self-Determination Act enacted in 1975.[48]  As applied to Alaska, this act authorized the BIA and the IHS to contract with Alaska Native Villages, or ANCSA village or regional corporations, to provide services to Alaska Natives that the BIA and IHS formerly provided.[49]  The act took time to implement.  The Alaska Tribal Health compact under which CRNA operates was not signed until 1994.  The transfer of the inpatient and

---

[43]     *Id.* at 34-41.

[44]     *See* 58 Fed. Reg. 54, 364-69 (1993).

[45]     *See John v. Baker*, 982 P.2d 738 (Alaska 1999).

[46]     *Native Vill. of Stevens*, 757 P.2d at 41.

[47]     43 U.S.C. § 1601(b); *see supra* notes 29 and 31 and accompanying text.

[48]     *See* 25 U.S.C. § 450(a)(1).

[49]     25 U.S.C. §§ 5321-32.

outpatient operation and management of the large IHS hospital in Anchorage to two tribal consortia took place in 1998 and 1999.[50]

In 2004 *Runyon* was decided, establishing in the courts of the State of Alaska that tribally owned Alaska nonprofit corporations acting as self-determination contractors under the ISDA do not possess sovereign immunity. Meanwhile, notwithstanding *Runyon*, tribally owned nonprofit corporations have flourished. By 2010, 6 of them were listed among Alaska's 50 largest employers, employing collectively from 5,250 to 6,700 workers.[51] Currently there are at least 18 such corporations, providing health care and social assistance services in the state; these 18 nonprofit corporations have collective annual revenues in excess of 3.2 billion dollars

---

[50] ALASKA NATIVE TRIBAL HEALTH CONSORTIUM, ABOUT US: OUR HEALTH IN OUR HANDS 8-9 (Jan. 2021), https://www.anthc.org/wp-content/uploads/2021/01/Our-health-in-our-hands.pdf.

[51] Economy of Alaska, Largest Employers, WIKIPEDIA, https://en.wikipedia.org/w/index.php?title=Economy_of_Alaska&oldid=1187072894 (citing Neal Fried, The *Trends* 100 25th ed., Alaska Economic Trends at 3 (July 2011), https://live.laborstats.alaska.gov/trends-articles/2011/07/trends-100-for-2010) (last visited Dec. 20, 2023) (using 2010 information).

and employ more than 16,000 workers.[52]  They are a significant part of Alaska's economy.[53]

**What Tribal Immunity Does**

Tribal organizations that possess sovereign immunity are bound by state and municipal laws when they engage in off-reservation activities.[54]  But tribal immunity insulates them from suits seeking redress for violations of such laws.[55]  So, as in this case, where the common law of Alaska imposes on every contract of employment an implied covenant obliging an employer to act fairly and in good faith toward its employees,[56] an employer with tribal immunity is legally required to comply with the covenant.  But the employer cannot be sued for failing to do so.  An employee

---

[52]    Information concerning tribally owned nonprofit corporations in Alaska was compiled from the website Cause IQ after searching for Alaska nonprofits.  CAUSE IQ,  https://www.causeiq.com/search/organizations/?q=Alaska&view=list (last visited Dec. 19, 2023).  The organizations I identified as tribally owned nonprofits are the following:  Alaska Native Tribal Health Consortium, Arctic Slope Native Ass'n, Ass'n of Village Council Presidents, Bristol Bay Area Health Corp., Aleutian Pribilof Islands Ass'n, Bristol Bay Native Ass'n, Chugachmiut, CRNA, Cook Inlet Tribal Council, Eastern Aleutian Tribes, Kawerak, Kodiak Area Native Ass'n, Maniilaq Ass'n, Norton Sound Health Corp., Southeast Alaska Regional Health Consortium, South Central Foundation, Tanana Chiefs Conference, and Yukon Kuskokwim Health Corp.  For each nonprofit, Cause IQ lists the total revenues and the number of employees.  *Id.*

[53]    For perspective, Alaska's GDP is approximately 63.6 billion dollars, Economy of Alaska, Statistics GDP, WIKIPEDIA, https://en.wikipedia.org/w/index.php?title=Economy_of_Alaska&oldid=1187072894 (last visited Dec. 20, 2023) (updated Sept. 29, 2023); and there were about 322,000 nonfarm jobs in Alaska in October 2023. ALASKA DEP'T OF LABOR & WORKFORCE DEVELOPMENT, Monthly Employment Statistics,  https://live.laborstats.alaska.gov/labforce/000000/01/00000000/ces/index.html (last visited Dec. 19, 2023).

[54]    COHEN'S 2012, *supra* note 33, § 7.03[1][a][i].

[55]    *Id.* § 7.05[1][a].

[56]    *Crowley v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 253 P.3d 1226, 1230 (Alaska 2011).

who has been the victim of such behavior has no remedy, and the employer's conduct is effectively unconstrained by the law that it is supposed to follow.

Tribal immunity bars suits by states or municipalities as well as by private litigants, but not suits brought by the federal government.[57] It applies to cases seeking damages, specific performance of contracts, injunctive relief, and declaratory judgments.[58] It bars all such actions whether based on common law, state constitutions, statutes, regulations, or municipal ordinances.[59] Tribal immunity also applies to administrative proceedings, such as workers' compensation claims.[60] In addition, it bars various forms of state-based compulsory procedures such as state investigative subpoenas.[61]

There are three exceptions. First, tort claims against tribal organizations which arise out of the performance of functions under self-determination contracts are, by statute, regarded as claims against the United States covered by the Federal Tort Claims Act.[62] Second, states may sue tribal officers for injunctive relief to prevent future unlawful conduct for which the tribal officers are responsible.[63] Third, tribal immunity does not shield tribal officials from prosecution under state criminal laws.[64]

---

[57]     COHEN'S 2012, *supra* note 33, § 7.05[1][a].

[58]     *Id.*

[59]     *Id.*

[60]     *See id.*; *see also Mendoza v. Isleta Resort & Casino*, 460 P.3d 467 (N.M. 2020) (dismissing workers' compensation claim because tribe had not expressly waived immunity).

[61]     COHEN'S 2012, *supra* note 33, § 7.05[1][a].

[62]     *See generally* Federal Tort Claims Act Coverage General Provisions, 25 C.F.R. §§ 900.180-.189 (2022); COHEN'S 2012, *supra* note 33, § 22.02[4].

[63]     *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014).

[64]     *Id.*

**Will Overruling *Runyon* Result In More Good Than Harm?**

This court takes the view that prior cases will not be overruled unless, among other things, the court is clearly convinced that more good than harm will come from doing so.[65] Will that standard be satisfied if *Runyon* is overruled? In my opinion the answer is "no," and the question is not close.

On a general level, there is a consensus among leading scholars and courts that the exercise of immunity by organizations is undesirable.[66] Immunity shields

---

[65] *Kinegak v. State, Dep't of Corr.*, 129 P.3d 887, 889 (Alaska 2006).

[66] *See Georgetown Coll. v. Hughes*, 130 F.2d 810, 812, 827 (D.C. Cir. 1942) (observing, in rejecting charitable immunity, that "[t]here is general agreement of [scholarly] opinion in support of liability and against immunity," "[t]he law's emphasis ordinarily is on liability, not immunity, for wrongdoing," and "[t]he rule of immunity is out of step with the general trend of legislative and judicial policy in distributing losses incurred by individuals through the operation of an enterprise among all who benefit by it rather than in leaving them wholly to be borne by those who sustain them"); *Muskopf v. Corning Hosp. Dist.*, 359 P.2d 457 (Cal. 1961) (abolishing governmental immunity and stating that "[t]he rule of governmental immunity for tort is an anachronism, without rational basis, and has existed only by the force of inertia"), *superseded by statute as recognized in Scruggs v. Haynes*, 60 Cal. Rptr. 355 (Cal. App. 1967); *Tuengel v. City of Sitka*, 118 F. Supp. 399, 400 (D. Alaska 1954) (rejecting claims of immunity and explaining that "[i]mmunity from suit is in disfavor in the United States because it is an anomaly in a republic and because of the general recognition of the fact that it is unjust to make the innocent victim of negligence bear the entire loss rather than to distribute the burden among the members of the general public"); *Ray v. Tucson Med. Ctr.*, 230 P.2d 220, 226 (Ariz. 1951) (explaining in decision rejecting charitable immunity that immunity "makes it compulsory upon [the injured party] . . . to donate to charity the amount he would otherwise be entitled to recover for his injuries"); *id.* at 229 ("Such a sweeping exemption from liability of charitable institutions seems to be clearly against public policy. The institution should be just before it is generous." (quoting 3 Scott on Trusts § 402, at 2150)); *Hungerford v. Portland Sanitarium & Benevolent Ass'n*, 384 P.2d 1009, 1010 (Or. 1963) (abrogating charitable immunity because "immunity was [when last affirmed by the court in 1955] and is now, in general retreat elsewhere" and "the obsolescence of charitable immunity likewise has been well documented by text writers," and

immune organizations from the normal duty to pay for injuries they inflict on others. Immunity thus grants a subsidy, but one which is paid not by the government, but by those who are harmed by an immune organization.[67] An important part of the legal history of the United States from the beginning of the Progressive Era through the first 70 years of the twentieth century consists of various actions taken to eliminate or

---

concluding "that expediency no longer justifies adherence to a dying doctrine"); *Tunkl v. Regents of Univ. of Cal.*, 383 P.2d 441, 448-49 (Cal. 1963) (holding contractual immunity from liability for research hospital contrary to public policy, rejecting argument that "otherwise the funds of the research hospital may be deflected from the real objective of the extension of medical knowledge to the payment of claims," and stating that "the hospital cannot claim isolated immunity in the interdependent community of our time" as "[i]t, too, is part of the social fabric, and prearranged exculpation from its negligence must partly rend the pattern and necessarily affect the public interest"); Edwin M. Borchard, *Government Liability in Tort*, 34 YALE L.J. 129 (1924); Edgar Fuller & A. James Casner, *Municipal Tort Liability in Operation*, 54 HARV. L. REV. 437 (1941); John St. Francis Repko, *American Legal Commentary on the Doctrines of Municipal Tort Liability*, 9 L. & Contemp. Probs. 214 (1942); *see also Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998) (6-3 decision) (Stevens, J., dissenting) ("Governments, like individuals, should pay their debts and should be held accountable for their unlawful, injurious conduct.").

This court joined the consensus view criticizing state sovereign immunity as unjust in *State v. Abbott*, 498 P.2d 712, 717-22 (Alaska 1972). Earlier, in *City of Fairbanks v. Schaible*, we corrected by statutory interpretation a misperception of some of the territorial courts and the Ninth Circuit that municipal immunity existed in Alaska. 375 P.2d 201, 209 (Alaska 1962), *disavowed on other grounds by Scheele v. City of Anchorage*, 385 P.2d 582, 583 (Alaska 1963). In the process we noted the "sharp criticism of the doctrine of municipal immunity" and extensively cited authorities critical of the doctrine. *Id.* at 206.

[67]  2 DAN B. DOBBS ET AL., THE LAW OF TORTS § 360, at 442 (2d ed. 2011) ("[A]ll of the reasons were founded . . . on the policy of subsidizing organizations denominated as charities. . . . But the[ir] subsidies were not paid by the state; they were paid by the victims whose recovery was denied — through a 'coerced donation' of their right of recovery."); *see also supra* note 66 and authorities cited therein.

ameliorate the consequences of organizational immunity.[68] These include numerous acts permitting tort and contract claims against governments and ensuring that the employees of governments have fair and effective remedies when they are injured at work or abused, harassed, or otherwise mistreated by their employers.[69] After a long struggle, charitable immunity has been eliminated in most jurisdictions and local and state government immunity has either been eliminated or ameliorated by statutes that

---

[68]    See, for example, the classical opinion of Justice Wiley Rutledge, then serving on the D.C. Circuit Court of Appeals, rejecting charitable immunity in *Georgetown College v. Hughes* and authorities cited therein, 130 F.2d 887 (D.C. Cir. 1942), and that of Justice Roger Traynor abolishing state and municipal immunity in *Muskopf v. Corning Hospital District* and authorities cited therein, 359 P.2d 457 (Cal. 1961).   Justice Rutledge wrote:   "The rule of immunity itself has given way gradually but steadily through widening, though not too well or consistently reasoned, modifications.   It is disintegrating.   Each modification has the justification that it is a step in result, if not in reason, from the original error toward eventual correction.   The process is nearing the end.   This leaves the steps untaken standing out as more anomalous."   *Georgetown Coll.*, 130 F.2d at 827.   Rejecting immunity, Justice Rutledge continued, would be to realize the "gain[] of eliminating . . . the anomaly that the institutional doer of good asks exemption from responsibility for its wrong, though all others must pay.   The incorporated charity should respond as do private individuals, businesses corporations and others, when it does good in the wrong way."  *Id*. at 828.

[69]    In 1887 Congress passed the Tucker Act, Act of March 3, 1887 ch. 359, 24 Stat. 505, permitting contract claims to be brought against the United States.  28 U.S.C. § 1491.  In 1946 the Federal Tort Claims Act was enacted giving general consent to tort claims against the United States.  60 Stat. 843.  Employees of the United States have well-developed administrative and judicial remedies against their employer under the Civil Service Reform Act of 1978.  Pub. L. 95-454, 92 Stat. 1111; *see Lindahl v. Off. of Pers. Mgmt.*, 470 U.S. 768, 773 (1985).  The State of Alaska has waived its immunity from tort and contract claims under AS 09.50.250, first enacted in 1962.  Ch. 101, § 26.01, SLA 1962.  This statute has certain exceptions, but in cases of doubt liability is the rule and immunity the exception. *Johnson v. State Dep't of Fish & Game*, 836 P.2d 896, 905 (Alaska 1991); *see also* 2 DAN B. DOBBS ET AL., THE LAW OF TORTS § 342, at 362 (2d ed. 2011) (noting that almost all states have tort claims statutes waiving blanket sovereign immunity).

ensure that those injured by government torts, contract breaches, and statutory violations have effective means of redress.[70]

Tribal immunity, like charitable immunity, unjustly subsidizes tribes at the expense of those they injure. But it has several additional negative effects. It constrains law enforcement efforts to protect the public by shielding immune organizations from the normal remedies provided in health and welfare laws, and may, as a practical matter, exempt them from compliance with such laws;[71] it frees them from compliance with their contract obligations with those who lack the foresight or bargaining power to insist on waiver clauses; and it frees them from respecting statutory rights that are enforced by employee-initiated litigation.

Despite the consensus view that organizational immunity is generally undesirable, today's opinion holds that endowing tribal consortia organized as Alaska nonprofit corporations with immunity will clearly do more good than harm. It so holds for one primary reason, and two secondary ones.

The primary reason is that a judgment against a tribally owned nonprofit corporation will take away funds destined to provide services to tribal members.[72] But this parallels the argument traditionally offered to support the now discredited doctrine of charitable immunity. If a charity must expend its funds paying for, for example, tortious injuries to others, or injuries its employees suffer at work, or contractual breaches, then to the extent that the charity does so it is limited in achieving its charitable objectives. Every dollar spent on behalf of a harmed claimant is unavailable to support the object of the charity's beneficence. Courts now realize that this line of

---

[70]     *Supra* notes 66-69 and accompanying text.

[71]     "Tribal immunity significantly limits, and often extinguishes, the States' ability to protect their citizens and enforce the law against tribal businesses." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 823 (2014) (5-4 decision) (Thomas, J., dissenting).

[72]     Opinion at 25.

reasoning makes those who are harmed as a result of a charity's activities unwilling contributors to its beneficial ends, and that this is unjust. Charities are enterprises, often large and sophisticated, and they should be responsible for their actions as a matter of course. The same holds true as a matter of logic and public good for corporate tribal consortia.

The court states, as a second reason, that unless CRNA has immunity, federal policies of "tribal self-determination, economic development, and cultural autonomy" will be undermined.[73] Just how these objectives are harmed by the status quo is unexplained.[74] I think what is meant is that with the cost saving that is inherent in immunity, consortia will be able to provide more services to tribal members, and with more services there will be more opportunities to decide the nature of those services, and thus more self-determination. But this is merely another benefit relating to the primary point that cost saving resulting from immunity leaves more money for services. It is answered in the same way: the saved costs unjustly burden the harmed individuals who are left to bear them.

---

[73]    Opinion at 24.

[74]    The opinion states: "It is critical to our analysis in CRNA's case that, despite being a separate legal entity, most, if not all of its federal funding comes directly from money *that would otherwise go to the tribes*." Opinion at 26 (emphasis added). I take this as shorthand for saying that the money would otherwise go to services for tribal members. That is the meaning that comes through from the paragraph of the litigation affidavit of CRNA's chairperson on which the opinion relies: "CRNA's budget is substantially based on federal funds provided to benefit its member Tribes and their Tribal members under the Compact and Annual Funding Agreement with the Secretary. CRNA does not agree that any damages are payable in this case, but if a damage award were imposed, it would be paid from our member Tribes' federal health care funding, and would have a direct and severe financial impact on our ability to provide health care services to our Tribal members. . . . A continued obligation for CRNA to defend itself in this matter will adversely impact CRNA's mission of providing the highest quality health care services possible to the Tribal communities of the Ahtna Region."

As a third reason supporting its more good than harm conclusion, the court refers to "the potential harm involved in leaving employers subject to two contradictory standards" where the determination of their immunity is a "function of the forum."[75] The United States District Court for the District of Alaska has held that corporate nonprofits have the immunity of their tribal owners.[76] The cases so holding conflict with *Runyon*, thus giving rise to the contradictory standards that according to today's opinion employers may find "cumbersome to interpret and understand."[77] Since it is now twenty years since *Runyon* was decided, we can be sure that all the tribally owned corporate nonprofits in Alaska understand that they will be held to be amenable to suit in state court cases and immune in federal court.[78] It seems unlikely that facing this reality creates much of a problem. The corporations likely assume amenability to suit in their business planning, and try to avoid litigation as much as possible by complying with Alaska law, honoring their contracts, treating their employees fairly, and buying workers' compensation insurance as well as liability insurance for activities unrelated to self-determination contracts. *Runyon* provides an incentive that encourages this conduct and this seems beneficial. Today's decision removes this incentive, and it is hard to look on this as weighing on the "good" side of the scale.

Conflicting interpretations of federal law by state courts and the lower federal courts are not uncommon. State courts have equal authority with the lower

---

[75]    Opinion at 27.

[76]    *See* Opinion at 27 n.109 (listing cases holding that Alaska tribal nonprofits have sovereign immunity).

[77]    Opinion at 27.

[78]    Unless they do business with a provider from the 10th Circuit. *See Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d 1144, 1149-50 (10th Cir. 2012); *Eaglesun Sys. Prods., Inc. v. Ass'n of Vill. Council Presidents*, No. 13-CV-0438-CVE-PJC, 2014 WL 1119726 (N.D. Okla. 2014).

federal courts to interpret federal law.[79] Neither is bound by the decisions of the other, although each should respect the decisions of the other to the extent justified by reason, precedent, and policy. Both are bound by the decisions of the United States Supreme Court which, on its own schedule, resolves important disparities between subordinate courts.[80] We can all await that day without much concern that corporate officers will fail to understand what conduct the present disparity requires.

In summary, the effect identified in the majority opinion's "more good than harm" discussion that has some positive consequences is that immune corporate nonprofits will be able save money by not paying for the harm for which, without immunity, they would be responsible. Through this means they will be able to offer more services to tribal members and, within prescribed limitations, determine what those services will be. Since this is like the rationale that was used to justify charitable immunity that has been discredited because it levies an involuntary subsidy on those who lose their rights because of immunity, I fail to see how this can be considered an overall benefit.

By contrast, the harms that will come from overruling *Runyon* are substantial and undeniable. As already noted, tribally owned nonprofit corporations form a large and important part of Alaska's economy. Today's decision immunizes these companies from the normal enforcement mechanisms built into Alaska's health, safety, employment, and civil rights statutes, and municipal ordinances of all sorts including tax, planning, zoning, and building codes. These laws are of vital importance. Once there is immunity normal enforcement tools are no longer available. All that is

---

[79] *Native Vill. of Tununak v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 334 P.3d 165, 175 (Alaska 2014); *Lockhart v. Fretwell*, 506 U.S. 364, 376 (1993) (Thomas, J., concurring).

[80] *Native Vill. of Tununak*, 334 P.3d at 175; *Hutto v. Davis*, 454 U.S. 370, 375 (1982) (per curiam).

left is prospective injunctive relief against the responsible corporate officials. At best this form of relief is awkward, slow, and expensive.[81] Because immunity thus interferes with the enforcement of state and municipal laws designed to ensure public welfare, it has a strong and definite negative impact.

Moreover, individuals will be left without any remedy against immunized organizations. Employees who have, for example, been sexually harassed or discriminated against on prohibited grounds such as race, gender, religion, or marital status, or who have worked overtime without proper compensation, will have no way of asserting claims against their employers. The same is true for employees whose employment contracts have been breached. At the present time contracts of employment, even those that are "at will," are rights-based because of the implied covenant of good faith and fair dealing and the various statutes designed to protect the health, safety, and economic security of employees that can be enforced by employees. Immunity will change this. Employees will have no avenues of recourse. Their contracts will not even be "at will," but at sufferance or whim.

Unpaid suppliers and contractors whose contracts have been breached will also be left without a remedy. In the future those with sufficient bargaining power will be able to protect themselves by bargaining for sovereign immunity waivers. But what about those who have already entered into contracts without waiver provisions? In the two decades since *Runyon* was decided, merchants and contractors have entered into countless transactions with tribally owned nonprofit corporations in a legal environment that ensured that normal state-sponsored means of redress would be available. Where contracts are entered into in a legal background created by a prior court decision, stare

---

[81] A series of violations is usually a prerequisite to injunctive relief, with the first violation beyond redress.

decisis concerns are said to be at their "acme."[82]  The right to sue for breach of contract is a property right,[83] and as such deserves strong protection.[84]  Nevertheless, the right to sue to enforce post-*Runyon* contracts will be lost as a result of today's decision.

In the post-*Runyon* period Alaska's tribally owned nonprofit corporations have been subject to state and local public welfare laws, and the normal remedies for enforcing these laws, as well as to common law remedies for contract violations.  There are costs associated with this status.  By all appearances these costs have been successfully internalized, for, as indicated above, these organizations have flourished.  The question whether it would do more good than harm to relieve them from these costs ultimately amounts to asking whether it is beneficial to have enforceable public welfare laws, and courts that enforce private rights.  If more good than harm would come from immunizing this important segment of our economy from the enforcement of Alaska laws, one must ask why all segments are not granted similar grace.  For-profit enterprises could use their saved costs to pay higher dividends, or salaries, or lower the prices of their goods and services, and nontribal nonprofits could expand their services.  But the judgment of generations of lawmakers — truly the judgment of society — is that public welfare laws are of vital importance, they work best when there are practical and efficient means to enforce them, private contracts should be enforceable, and individuals whose rights have been violated by their employers should have effective

---

[82]    *Payne v. Tennessee*, 501 U.S. 808, 828 (1991) ("Considerations of stare decisis are at their acme in cases involving property and contract rights, where reliance interests are involved . . . .").

[83]    *See Bush v. Reid*, 516 P.2d 1215, 1219 (Alaska 1973) (holding that a chose in action "is a form of property"); *Chose in action*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "chose in action" as including a "right to bring an action to recover a debt, money, or thing").

[84]    *State Oil Co. v Khan*, 522 U.S. 3, 20 (1997) (acknowledging that "stare decisis concerns are at their acme in cases involving property and contract rights").

remedies. Because I agree with these views, I am a great distance away from being able to conclude that more good than harm would come from overruling *Runyon*.

**CHOICE OF LAW**

For the reasons stated above I think the majority opinion is plainly and disturbingly wrong in concluding that overruling *Runyon* would do more good than harm. But my views on this subject would not be fairly expressed without adding that I doubt that this standard should be applied when considering the question under review. Whether CRNA is an arm of its tribal owners and therefore has tribal sovereign immunity is a question of federal law. While this court has the power to interpret questions of federal law, it does not have the power to question the wisdom of federal law. Therefore I believe that once the majority concludes that *Runyon* must be overruled (a conclusion with which I disagree), it does not need to ask whether overruling *Runyon* would do more good than harm. It has no choice at that point but to overrule *Runyon* and make a ruling that complies with federal law. The court could not refuse to follow federal law merely because it believed that doing so would be harmful.

But this would still leave for resolution the question of which version among competing iterations of federal law should be selected. In making this choice, as with all choice of law questions, policy would have an important role.[85] The standard to be employed would be to "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[86]

The question would be whether, on the one hand, to adopt the 9th Circuit approach exemplified by *White v. University of California*,[87] which seems to apply its

---

[85] *See* Opinion at 6: In exercising de novo review "we will adopt the rule of law that is most persuasive in light of precedent, reason, and policy"; *and see Long v. Holland Am. Line Westours, Inc.*, 26 P.3d 430, 432-33 (Alaska 2001) (considering policy of Alaska in choice of law question).

[86] Opinion at 6.

[87] 765 F.3d 1010, 1026 (9th Cir. 2014).

multifactor test to tribally related corporations even if they are incorporated under state laws that require corporations to be amenable to suit; or, on the other, to adopt the 10th Circuit approach in *Somerlott*, which excludes from its multifactor test corporations formed under state law.[88]

My opinion as to which approach is more persuasive in terms of reason, precedent, and policy is evident from the discussion in the preceding sections of this dissent. To briefly summarize, the interrelated benefits that result from adopting the *Somerlott* approach are the following:

(1) Even if the financial insulation rationale of *Runyon* is disavowed, its rule of decision, that tribally owned Alaska nonprofit corporations are not immune from suit, would be undisturbed. This would preserve the consistency and reliance values meant to be advanced by the rule of stare decisis. In particular, the contract rights of all those who have contracted with the corporations, including corporate employees, would continue to be enforceable.

(2) Tribally owned corporate nonprofits, like all entities, should pay their debts and be held responsible for their unlawful, injurious conduct. This desideratum would be advanced under *Somerlott* and frustrated under *White*.

(3) The grant of immunity from private suit to an enterprise is undesirable because it effectively requires some of the costs of the enterprise to be involuntarily paid by those whom the enterprise injures. The grant of immunity from public law enforcement is undesirable because it limits the ability of state and local governments to protect their citizens under public welfare laws. These undesirable effects would be avoided under *Somerlott*, and realized under *White*.

---

[88] *Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d 1144, 1149-50 (10th Cir. 2012).

(4) The grant of immunity in this case would deprive thousands of Alaska employees of their ability to obtain redress against their employers for statutory and contract violations.  This would not occur under *Somerlott*.  It will under *White*.

**CONCLUSION**

Twenty years ago this court held that corporations owned by tribes do not have tribal immunity because the corporate form protects tribal assets from compulsory process.  Now the rationale of that holding has been challenged.  The court could reconfirm this holding on the narrower ground, accepted in several jurisdictions, that as a matter of law state-chartered corporations cannot have tribal immunity.  This would permit the court to postpone review of the challenged rationale to a future case where the narrower ground does not apply.

Instead, today's opinion shatters the expectations of those who have relied on our prior holding by embracing the directly opposite position that the corporations in question now have immunity.  The opinion concludes that this result will do more good than harm, while minimizing as mere speculation the problems created by untethering an important sector of the Alaska economy from the normal processes of Alaska law.  It also fails to acknowledge that Ito's claim must be presumed valid, or that thousands of employees like her will no longer be protected by Alaska law.

I believe that the principle of stare decisis counsels that we should reconfirm our earlier holding on the ground stated.  Nor do I share in the opinion's narrow view of the consequences of its decision.  Relegating employees to the powerless status they held in the early twentieth century and placing a sector of the economy off-limits to normal law enforcement efforts designed to protect public health and welfare cannot be regarded as other than seriously harmful.  I thus dissent.